# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Patel, 2013 IL App (4th) 121111**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DINESH PATEL, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-12-1111 |
| Filed | September 11, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a prosecution for unlawful delivery of a controlled substance containing synthetic cannabis arising from defendant's sale of a "spice" while working at a convenience store, the evidence only established that defendant knew he was selling a professionally packaged product called "Bulldog" that was identified as a "spice," that defendant knew it was smoked by some people, that it was not on open display, and that the store owner said the product was legal to sell and he had a certificate supporting that claim; therefore, defendant's conviction was reversed on the ground that the State failed to prove the knowledge element of the offense beyond a reasonable doubt. |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 12-CF-170; the Hon. James E. Souk, Judge, presiding. |
| Judgment | Reversed. |

Counsel on
Appeal

George Pappas (argued), of Chicago, for appellant.

Jason Chambers, State's Attorney, of Bloomington (Patrick Delfino, Robert J. Biderman, and Thomas R. Dodegge (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE POPE delivered the judgment of the court, with opinion.

Justices Turner and Holder White concurred in the judgment and opinion.

## OPINION

¶ 1    In August 2012, the trial court found defendant, Dinesh Patel, guilty of unlawful delivery of a controlled substance (substance containing AM-2201 (synthetic cannabis) (1-(5-fluoropentyl)-3-(1-naphthoyl)indole) (720 ILCS 570/401(e) (West 2010)). Defendant appeals, arguing (1) the State failed to prove his guilt beyond a reasonable doubt and (2) his conduct was the result of a mistake of fact, a defense to this crime. We reverse defendant's conviction.

¶ 2                        I. BACKGROUND

¶ 3    In March 2012, a grand jury returned a two-count indictment against defendant, charging him with the unlawful delivery of a controlled substance. Count I alleged defendant knowingly and unlawfully delivered more than 1 gram but less than 15 grams of a substance containing AM-2201 (synthetic cannabis) (720 ILCS 570/401(e) (West 2010)). Count II alleged defendant knowingly and unlawfully delivered less than 1 gram of a substance containing AM-2201 (synthetic cannabis) (720 ILCS 570/401(d)(i) (West 2010)). The State dismissed count II prior to trial.

¶ 4    At defendant's trial, Alex Cole, a student at Illinois State University, testified he was arrested by the McLean County sheriff's department for selling marijuana on February 9, 2012, and subsequently became a confidential source for the sheriff's department. As of defendant's trial, the State had not filed any charges against him.

¶ 5    Cole testified Detective Tim Tyler of the McLean County sheriff's department contacted him on February 23, 2012, via text message about a gas station possibly selling an illegal substance to the public. Cole met with Detective Tyler later that day. Tyler directed Cole to the BP Amoco station in Lexington, Illinois, and told him to go inside and purchase a specific kind of "spice" called California Kush. Tyler said not to purchase it if it was on display, in open view, or marked as legal. Tyler searched Cole and his car and gave him $40 in marked or recorded money.

-2-

¶ 6    Inside the gas station, Cole did not see any "spice" or any marked display saying the "spice" was legal. Cole approached defendant, who was behind the register, and asked if he had any Cali Kush or California Kush. The clerk said he did not have any but had another product which was the same. Defendant presented him with a jar labeled "Bulldog" from underneath the counter. Cole bought the product using the money Detective Tyler provided him. Defendant gave him change but not a receipt. Cole then left and met Detective Tyler and gave him the "Bulldog" and change.

¶ 7    On cross-examination, Cole testified he was not sure where defendant put the money he gave him but said it was probably the cash register. He testified defendant gave him change from the cash register.

¶ 8    Tim Tyler, a detective with the McLean County sheriff's department, testified he had a case against Cole for selling cannabis. On February 23, 2012, Tyler contacted Cole about making a controlled buy at the BP Amoco station in Lexington. Tyler directed Cole to ask for California Kush or Cali Kush. Tyler told Cole not to buy the product if it was readily displayed for sale or advertised as legal "spice."

¶ 9    Tyler had been told the "spice" "was not readily for sale [at the gas station] and you had to be a previous customer or person known to them in order to purchase it." Defense counsel made a hearsay objection. The judge ruled the statement was not being introduced for the truth of the matter asserted but to explain the detective's actions and the instruction he gave Cole.

¶ 10    After Cole purchased the "Bulldog," he gave it to Tyler. The "Bulldog" was sent to a crime lab for testing. At approximately 4:30 p.m. the day of the controlled buy, the crime lab informed Tyler the "Bulldog" contained a listed controlled substance. Based on the evidence collected, a search warrant was issued for the gas station. The warrant was executed around 6 p.m. Defendant was not present at the time. Zora Singh, another store clerk, was working at the time. The money provided to the confidential source was not found at the gas station during the search.

¶ 11    Detective Tyler testified he interviewed defendant later that evening after he was taken into custody. A video recording was made of the interview, which was played for the trial court.

¶ 12    Tyler admitted he did not know whether "Bulldog" was illegal when Cole gave it to him after the controlled purchase. According to Tyler, "spice" was legal until January 1, 2012, and was still legal as long as it did not contain certain chemicals. The following exchange then occurred:

    "[DEFENSE COUNSEL]: So a clerk working the morning shift, you would have to know what products are legal and what products aren't legal?

    [THE STATE]: I'm going to ask for an objection here as to speculation, as to what a clerk on a certain day someplace else–he's asking for a hypothetical.

    [THE COURT]: Do you want to rephrase that?

    [DEFENSE COUNSEL]: Yeah. So a clerk would have to know what brands of Spice were legal and what was not legal. Right?

[THE STATE]: Objection, again speculation. The clerk would know.

[DEFENSE COUNSEL]: In order to be in compliance of the law they would have to know the difference, what was in the different Spice products?

[THE STATE]: Now we are asking the officer for a conclusion of law. I object to that also.

[DEFENSE COUNSEL]: No, I'm just saying that isn't it true that a clerk would have to be able to differentiate what is legal and what isn't as far as the Spice products as of January 1st.

[THE COURT]: Well that really gets into asking for some legal conclusion as to what knowledge the clerk would or wouldn't have to have in order to be in compliance with the law, so you're really asking the officer for an opinion about what it would take for the clerk to be breaking the law and I think that is what we are here about today. So I'll sustain the objection."

¶ 13    Detective Tyler testified he knew of no reliable field test he would feel comfortable using to test "spice." Tyler testified the fact Cole was not given a receipt after purchasing the "Bulldog" led him to believe the gas station was selling "Bulldog" off the books. Tyler admitted he did not know whether Cole asked for a receipt. Cole only told him he did not get a receipt. The police found receipts at the gas station for "incense" showing a purchase price of $27.74, which was the price Cole paid for the "Bulldog."

¶ 14    Tyler testified defendant told him the gas station sold Cali Kush and Diesel in December 2011. Defendant also told Tyler during a 21-day period in January the gas station did not sell any kind of "spice."

¶ 15    Defense counsel attempted to question Tyler about a lab report and letter provided by Kuldeep Chatha, the owner of the gas station, to the police which showed a substance called "California Kronic" was tested on January 12, 2012, by Toxicology Associates, Inc. The report stated certain listed substances were not found in "California Kronic." The report did not reference the substance at issue in this case, AM-2201. The letter was from S.A. Wholesale, LLC, stating its brands were California 10X, Bulldog, Diesel, Pandora, and Four Elements, not California Kronic. According to the letter:

"S.A. Wholesale, LLC (and Partners) only sell and distribute AROMATHERAPY products and are for fragrance purposes only, they are NOT TO BE USED IN ANY OTHER WAY. Our company, distributors, and retailers ARE NOT responsible for the misuse of any of our products.

These products DO NOT contain any of the following substances listed on Illinois HB 2089 (Public Act 097-0193) and (or) HB 2595 (Public Act 097-0192) ***."

The State objected to the introduction of this evidence and questions related to it on hearsay grounds. Defense counsel argued he was not introducing the report or questioning Tyler to establish the truth of the lab reports or letter but as support for defendant's belief he was selling a legal product based on what he was told by the station owner, Kuldeep Chatha. The trial court admitted the lab report, letter, and Tyler's testimony with regard to the report and letter for a limited purpose, stating:

-4-

"Well I'll admit the exhibit and the testimony for the limited purpose of establishing that the owner apparently provided some documentation to Detective Tyler that in an apparent effort to establish he had some basis for thinking whatever product he was selling was legal. Obviously the document does not establish that; but for that limited purpose and I suppose to show there was some sort of document in his possession which would be perhaps some corroboration for what the defendant told the detective that he had been told it was okay because he had a certificate, I'll allow it for that limited purpose."

¶ 16    John Sandage, a lieutenant with the McLean County sheriff's department, testified he took part in the search of the gas station. During the search, he pried open the door to the office because it was locked and found two black boxes containing "Bulldog." The employees present at the gas station when the search was done said they did not have a key to the office. Sandage called Kuldeep Chatha, the station owner, and waited for him to arrive. (We note, in his complaint for a search warrant, Detective Tyler stated defendant was the station owner.)

¶ 17    Chris Renken, a detective with the McLean County sheriff's department, testified he accompanied Detective Dave Fritts as part of a surveillance group for the controlled buy. From outside the gas station, they watched Cole purchase the "spice," walk back out to his car, and then drive back to Detective Tyler. Renken was also involved in arresting defendant at the trailer where he lived. Renken searched defendant and did not find the money used by Cole to purchase the "Bulldog" or any other money on his person, nor any "spice."

¶ 18    Detective Fritts, of the McLean County sheriff's department, was one of the detectives who served the search warrant on the gas station. Fritts took photographs inside the gas station. The pictures showed a few jars of "Bulldog" underneath a notepad next to the register, more jars underneath the counter, and a large amount of loose cash under the register, apparently from lottery ticket sales. Fritts testified a bar code on the side of the register was scanned when "Bulldog" was purchased. The containers of "Bulldog" did not have a bar code on them.

¶ 19    The store had pipes on display behind the counter which could be used to smoke tobacco, marijuana, or "spice." To his knowledge, the workers present when the search was conducted did not have a key to the office at the gas station. Fritts testified another brand of "spice" called "Passion Fruit" was found at the gas station. Fritts did not know if the "Passion Fruit" was legal or illegal "spice." Fritts testified he did not find "Bulldog" or "Passion Fruit" on display in the gas station.

¶ 20    Stan Hoselton, who lived in Lexington and was a member of the McLean County board and the liquor control commission, testified on defendant's behalf. He had known defendant for three or four years. He spoke to defendant almost every morning when he went to the McDonald's adjacent to the BP Amoco station. Based on his numerous conversations with defendant, Hoselton opined defendant did not know he was selling an illegal product. Hoselton described defendant as a gentleman to the customers at the gas station and someone he would hire. Hoselton believed defendant to be an honest man.

¶ 21    Defendant called Zora Singh, who also worked at the gas station as a cashier. Singh

testified defendant worked from 5 a.m. to 3 p.m. At the time of the alleged offense, Singh and defendant lived together in a trailer provided by their employer. Singh stated he never knowingly sold anything illegal at the gas station. In 2011, the gas station sold small plastic containers of potpourri or incense with names like "Bulldog," "Diesel," and "California Kronic" for $19.99 per container. In 2012, the price increased to $24.99. When the gas station first began selling the potpourri or "spice" in 2011, some of the plastic containers were usually displayed in a locked, glass case by the door. However, the "spice" itself was always stocked under the counter by the cash register. If a customer bought "Bulldog" with a credit card, a receipt automatically printed. If a customer paid with cash, a receipt was provided if one was requested. Regardless of whether a receipt was provided, all sales were recorded by the cash register. Singh testified money from lottery sales was not placed in the cash register but rather was kept underneath the counter. Singh testified people buy "Bulldog" to smoke. According to Singh, no one told him not to put the "Bulldog" on display.

¶ 22    Defendant testified on his own behalf with the aid of an interpreter. He was born in India in 1966. His wife and 18-year-old son lived in India. He came to the United States in 2003 and worked at a Dunkin' Donuts in New Jersey for six years. He sent money he earned back to India for his wife and son. Defendant quit working at the gas station after he was arrested.

¶ 23    Defendant had worked at the gas station for 1½ years. He did not have access to the safe or the back room of the gas station. The gas station owner usually came into the station at night when defendant was not there. Defendant worked from 5 a.m. to 3 p.m., seven days a week. He made $2,000 per month and was allowed to live in the trailer with Zora. He testified he did not count or deal with money or buy or order products. When someone purchased "Bulldog," he placed the money in the cash register.

¶ 24    Defendant testified he did not know why Kuldeep Chatha did not want to display the "Bulldog." Defendant testified he was never aware he was selling anything illegal to anybody. The money for lottery ticket purchases was placed under the counter in the open register. Defendant did not remember Cole buying the "Bulldog."

¶ 25    On cross-examination, defendant testified he did not know what "spice" was before he was arrested. When asked why he told Detective Tyler he knew what "spice" was, defendant stated it could have been due to his limited understanding of the English language. At trial, defendant was assisted by an interpreter. He did not have an interpreter to assist him during his interview with Detective Tyler. Defendant stated he was nervous and scared when he talked to Detective Tyler because it was the first time he had ever been arrested. He could give basic information like his name and address, but he might have had trouble with details of the matter. At the time, he did not know people used "spice" to smoke and get high. The following exchange then occurred:

"[THE STATE]: Did you know all forms of Spice were made illegal on January 1st of 2012?

[THE INTERPRETER]: Nobody had told him or notified him, so he had no idea.

[THE STATE]: You were ignorant of the law, is that what you're saying?

[THE INTERPRETER]: He's trying to understand exactly where you're coming

-6-

from. He's not fully understanding the question.

[THE STATE]: You were unaware of the law making Spice illegal, is that correct?

[THE INTERPRETER]: He didn't know of that law.

[THE STATE]: So you were unaware of the law, correct?

[DEFENSE COUNSEL]: Your Honor, I object to the phraseology of Spice because it[']s sold as potpourri, also sold as incense, so that's I think a word the prosecution and the detectives are using but even in the receipt it comes out as incense and on Exhibit 1, if I could look at Exhibit 1, I don't even think the word Spice is on this Exhibit 1. I don't believe Spice is even on this. It says–it's not for human consumption is on there–

[THE STATE]: If I'm not mistaken, counsel used the term Spice several times in questioning–

[THE COURT]: Overruled, you may ask. Move on.

[THE STATE]: Thank you.

[THE STATE]: So it's your testimony that you did not know that Spice was illegal as of January 1st of 2012 in Illinois?

[THE INTERPRETER]: That is correct."

Defendant testified he was under the impression people put "Bulldog" in a cigarette to smoke, although he had never seen anyone do so.

¶ 26 Kuldeep Chatha told defendant he had a certificate saying "Bulldog" was legal to sell, but defendant never saw the certificate. The following exchange then occurred:

"[THE STATE]: Why did Mr. Kuldeep[,] if you know[,] tell you he had a certificate to sell the Bulldog.

[DEFENSE COUNSEL]: I would object, that is speculation.

[THE STATE]: I just asked him if he knew. If he doesn't know, he can answer–

[THE INTERPRETER]: I'm sorry, could you please repeat the question?

[THE STATE]: Sure. If you know, why did Mr. Kuldeep tell you he had a certificate for selling Bulldog?

[THE INTERPRETER]: So he's to sell it, Kuldeep used to have it at [the] Morris store as well and so they stopped selling it over there and so during that very time he had called Dinesh to talk to him about that and that's when Dinesh asked like why did you stop selling it in the Morris store and that's when Kuldeep mentioned that he had a certificate now to sell it.

[THE STATE]: Okay. So you were concerned about why you weren't selling Spice anymore, is that correct?

[THE INTERPRETER]: Okay. He was just concerned that if there was anything illegal involved in there.

[THE STATE]: You were suspicious, is that correct?

[THE INTERPRETER]: He has–his nephew has a store in Seneca, Illinois, and they had stopped selling it. So he was sort of suspicious due to that.

[THE STATE]: Okay. You were suspicious that the Spice being sold in the store may be illegal, is that correct?

[THE INTERPRETER]: Yes because the other store stopped selling it and then Kuldeep was selling it over here.

[THE STATE]: And you continued to sell it on behalf of Mr. Kuldeep. Is that correct?

[THE INTERPRETER]: Yes.

[THE STATE]: Even though you thought it might be illegal. Correct?

[DEFENDANT]: No.

[THE INTERPRETER]: Yeah, well he mentioned that he believed it interesting because Kuldeep mentioned the certificate to it, that he had a certificate so he believed him.

[THE STATE]: Now earlier I'd asked you whether you knew whether all forms of Spice were illegal by statute and you said no. Is that correct? I'll repeat the question.

Earlier I asked you if you had known whether or not all forms of Spice were made illegal on January 1st 2012, is that correct?

[THE INTERPRETER]: He didn't know, that is correct.

[THE STATE]: But you were still suspicious that it could be illegal to sell the Bulldog Spice. Is that correct?

[THE INTERPRETER]: Yeah, he believed Kuldeep when he said that he had a certificate so he fully believed the fact that there shouldn't be anything (inaudible) with that.

[THE STATE]: You never saw the certificate, correct?

[DEFENDANT]: No."

Defendant testified customers told him they would have to go to stores in Bloomington to buy "spice" when his gas station did not have any.

¶ 27    After listening to closing arguments, the trial court provided the following reasoning for finding defendant guilty:

"Well, the Court has listened carefully to the evidence and reviewed what it believes to be the law related to this matter, and the Court would note that [the State] has stated in some detail the statute 720 ILCS 5/4-8, which indicates a person's ignorance or mistake [as to] a matter of either fact or law except as provided in Section 4-3(c) above is a defense if it [negates] the existence of the mental state which the statute proscribes with respect to an element of the offense, and then Subparagraph B goes on to outline situations which [the State] went through.

Section 4-3(c) states, 'Knowledge that certain conduct constitutes an offense or knowledge of the existence, meaning, or application of the statute defining an offense is not an element of the offense unless the statute clearly defines it as such.'

When you read those sections together and consider the statute that we're involved with here, that mental state that's required here is to knowingly deliver the substance

-8-

containing I can't remember the number, the AM-2201.

It's not an element of the offense to know that the substance is illegal, because it's a Schedule 1 or a Schedule 2 drug or otherwise illegal for some other reason.

The element of the offense is to knowingly deliver it.

The defense that is tendered here that the Defendant would have to consciously know he was delivering an illegal substance is not a valid defense here because that knowledge that it's illegal is not an element of the offense, and there undoubtedly is a very good reason for the way the law is structured in this regard.

You know, I don't want to get into giving a million examples, but people could just plead ignorance of certain things, and get out of all kinds of serious offenses by just saying, well, I didn't know it was a crime.

I don't think that's required here. The Court has to follow the law. There isn't any doubt that the Defendant knew what he was delivering here, which was Bulldog, which was–you know, contained this substance.

The delivery that he made was knowing. He sold it as a convenience store clerk, and once the substance turns out to be illegal, he's responsible for knowing what he's selling, and if he sells something that's illegal and he didn't check it out and didn't make enough of an investigation, well, frankly, most of the evidence in that regard in the Court's view is more mitigation, if it's to be believed, so I think even taking the facts in the light most favorable to the Defendant, the Court would have to find him guilty of this offense.

Having said that, the Court would otherwise still find him guilty, because the Court believes from the evidence presented that the Defendant did know what he was selling.

All the facts indicated, including the partial admissions made by the Defendant, indicated a circumstance in which he clearly knew what was going on here.

These spice items were sold before the law changed on January 1st that were on display. They were taken off the shelves for a period of time in January, and then the items are no longer on display. The Bulldog is under the counter or back in the back room. People coming in have to ask for it. No display items put back up, even though a number of items are being sold.

The Defendant knows it's used to smoke. He knows by his own admission that there's some problem here. His nephew is not selling it anymore, he's making inquiries, and supposedly he just takes the word of the owner that there's a certificate which makes it all okay.

The Court does not find the Defendant's protestations that he didn't in fact know it was illegal when he was selling it to not be credible and finds that even if he did have to know that under the law, the Court would still find him guilty based on the evidence that's been presented."

¶ 28    In September 2012, defendant filed a motion to reconsider or grant a new trial. Defendant argued the trial court erred in finding defendant's affirmative defense of mistake of fact was not applicable. Defendant noted the court found "the requisite mental state of knowledge only went to the delivery element of the offense, not to the issue of whether or not Dinesh

knew that the Bulldog incense contained a controlled substance." In addition to the affirmative defense, defendant also argued the State failed to establish he was consciously aware the "Bulldog" he sold contained a controlled substance or a substantial probability existed the "Bulldog" contained a controlled substance. Defendant argued:

"The label attached to the Bulldog product clearly states that the product does *not* contain an illegal substance and that it is not for human consumption. The product was *not* sold in plastic Baggies or in Ziplock bags which are common packaging materials used in selling controlled substances. In contrast, the product was sold in sealed little round plastic jars with a label provided by the manufacturer. How the Bulldog product was packaged would not be a red flag to cause a store employee to wonder whether or not the substance inside was legal. The plastic canister of Bulldog that Dinesh sold to the confidential source (C/S) was introduced into evidence as People's Exhibit #1. The canister of Bulldog doesn't list any ingredients or have the word 'spice' on the label." (Emphases in original.)

In denying the motion, the court stated:

"The Court considered all the evidence and the arguments that were made at the time of trial. The Court ruled then and continues to rule that Mr. Patel did not actually have to have knowledge that the Bulldog had become an illegal substance.

It's–I suppose we could think of all kinds of situations where a person who's selling materials to the public which are already packaged by somebody that might either be illegal or illegal for certain people that you come in and say, [']well, I didn't know what the law was about that,['] that's simply not a defense in my view, but the Court also made an alternate ruling that it did not believe Mr. Patel and, based on the evidence presented, believed that he did know that the substance was illegal, so the Defendant's motion is denied."

The trial court then held a sentencing hearing and sentenced defendant to 30 months' probation.

¶ 29    This appeal followed.

¶ 30                        II. ANALYSIS

¶ 31    We first address defendant's argument the State failed to prove beyond a reasonable doubt he knowingly delivered a controlled substance because the State failed to establish he knew the "Bulldog" he sold contained a controlled substance. Defendant does not dispute he sold a product which contained a controlled substance. At issue is whether he *knew* the product he sold contained a controlled substance.

¶ 32    Section 401 of the Illinois Controlled Substances Act states, in relevant part, "[e]xcept as authorized by this Act, it is unlawful for any person *knowingly* to manufacture or deliver, or possess with intent to manufacture or deliver, a controlled substance other than methamphetamine, a counterfeit substance, or a controlled substance analog." (Emphasis added.) 720 ILCS 570/401 (West 2010). Our supreme court has stated "[t]he three elements of the crime of unlawful possession of narcotics with intent to deliver are: the defendant had

knowledge of the presence of the narcotics, the narcotics were in the immediate possession or control of the defendant, and that the defendant intended to deliver the narcotics." *People v. Robinson*, 167 Ill. 2d 397, 407, 657 N.E.2d 1020, 1026 (1995).

¶ 33 This is not an absolute liability offense. A defendant cannot be convicted simply because he sold a product containing a controlled substance. Based on the record in this case, it is clear defendant knew he was selling "Bulldog." It is also clear the "Bulldog" he sold contained a controlled substance. However, contrary to the trial court's initial reasoning for finding defendant guilty, this does not establish defendant's guilt.

¶ 34 Under the trial court's initial reasoning, a person staffing a bake sale could be convicted of delivery of a controlled substance for selling a marijuana-laced brownie even if he had absolutely no knowledge the brownie contained the controlled substance. The same would be true for a grocery store clerk selling a bag of cocaine, professionally packaged to look like flour, even if she thought she was only selling flour.

¶ 35 Although the trial court's legal reasoning discussed above was incorrect, the trial court also stated:

> "Having said that, the Court would otherwise still find him guilty, because the Court believes from the evidence presented that the Defendant *did know what he was selling*.
>
> All the facts indicated, including the partial admissions made by the Defendant, indicated a circumstance in which he clearly knew what was going on here." (Emphasis added.)

Because the court made a factual determination defendant knew what he was selling, defendant must establish the evidence was not sufficient to support this finding. The question for this court is whether the evidence before the trial court was sufficient for any rational trier of fact to find defendant knew the "Bulldog" he was selling contained a controlled substance.

¶ 36 We will reject a challenge to the sufficiency of the evidence if any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *People v. Wheeler*, 226 Ill. 2d 92, 114, 871 N.E.2d 728, 740 (2007). An appellate court will not retry a defendant when considering a challenge to the sufficiency of the evidence. *Wheeler*, 226 Ill. 2d at 114, 871 N.E.2d at 740. Further, the State is given the benefit of all reasonable inferences, and the evidence is considered in the light most favorable to the prosecution. *Wheeler*, 226 Ill. 2d at 116, 871 N.E.2d at 741. In addition, we consider "[t]he trier of fact *** best equipped to judge the credibility of witnesses," and we give due consideration to the fact the trier of fact saw and heard the witnesses. *Wheeler*, 226 Ill. 2d at 114-15, 871 N.E.2d at 740.

¶ 37 That being said, " '[a] judgment of conviction can be sustained only upon credible evidence that removes all reasonable doubt of guilt, and where the evidence of the prosecution is improbable, unconvincing, or contrary to human experience, we will not hesitate to reverse' that conviction." *People v. Ortiz*, 196 Ill. 2d 236, 267, 752 N.E.2d 410, 429 (2001) (quoting *People v. Stevenson*, 25 Ill. 2d 361, 365, 185 N.E.2d 199, 201 (1962)). Our review "must include consideration of all the evidence, not just the evidence convenient to the State's theory of the case." *Wheeler*, 226 Ill. 2d at 117, 871 N.E.2d at 742.

¶ 38 In *Ortiz*, the defendant was convicted of drug trafficking and sentenced to 35 years'

imprisonment following a bench trial. *Ortiz*, 196 Ill. 2d at 239, 752 N.E.2d at 414. His conviction arose out of a December 9, 1994, traffic stop by an Illinois state trooper. The trooper described the defendant, who was driving a semi-tractor trailer, as " 'extremely nervous' " during the stop even though his paperwork appeared in order. *Ortiz*, 196 Ill. 2d at 240-41, 752 N.E.2d at 414. Defendant told the trooper he and a friend of his were driving two trucks containing oranges from California to New Jersey. *Ortiz*, 196 Ill. 2d at 241, 752 N.E.2d at 415. The trooper found the pay arrangement defendant described as unusual for a truck driver. *Ortiz*, 196 Ill. 2d at 241, 752 N.E.2d at 415. The trooper had been a truck driver for 15 years prior to becoming a police officer. *Ortiz*, 196 Ill. 2d at 241, 752 N.E.2d at 415.

¶ 39    The trooper also found unusual the defendant's statement his trailer was only half-full on a cross-country trip. The defendant said his friend had loaded his truck first and defendant just took what was left of the load. *Ortiz*, 196 Ill. 2d at 242, 752 N.E.2d at 415. The trooper inspected the truck and gave the defendant a written warning. After returning the defendant's documentation and advising defendant he was free to go, the trooper asked if the defendant had anything illegal in the vehicle. The defendant turned his head away and replied, " 'No, do you want to look?' " *Ortiz*, 196 Ill. 2d at 242-43, 752 N.E.2d at 415-16.

¶ 40    The defendant was with other troopers during the search. The trooper conducting the search found the trailer was half-full of boxes labeled as containing oranges. He climbed over the boxes to the front of the trailer, shone his flashlight down between the boxes and the front of the trailer, and saw a sheet of aluminum "diamond plate" attached to the front wall of the trailer, which appeared to be fairly new and was obviously not part of the original makeup of the trailer. *Ortiz*, 196 Ill. 2d at 243, 752 N.E.2d at 416. The trooper could see more than one yellow-wrapped package between the plate and the front wall of the trailer. The trooper punctured one of the packages and the substance inside appeared to be cocaine. *Ortiz*, 196 Ill. 2d at 243, 752 N.E.2d at 416.

¶ 41    The trooper exited the trailer and placed the defendant under arrest, informing him he found cocaine in the vehicle. The trooper testified the defendant " 'just basically submitted to the arrest. He didn't ask why or where or who or anything. He just showed very little emotion.' " *Ortiz*, 196 Ill. 2d at 243, 752 N.E.2d at 416. The estimated street value of the cocaine found in the truck was $30,760,000. The police also recovered two pagers from the visor above the driver's seat of the truck. *Ortiz*, 196 Ill. 2d at 243-44, 752 N.E.2d at 416.

¶ 42    The trooper admitted when he was a trucker he hooked his tractor to preloaded trailers without observing the loading process and only looked insider the trailer to make sure the load was secure. If the load looked secure, he did nothing further. *Ortiz*, 196 Ill. 2d at 244, 752 N.E.2d at 416.

¶ 43    Another trooper, who was with the defendant during the search of the truck, testified defendant looked very nervous during the search and mostly watched the rear of the truck. *Ortiz*, 196 Ill. 2d at 244, 752 N.E.2d at 416. An Ottawa police officer testified he interviewed the defendant after his arrest and described the defendant as being very calm during the interview. The defendant told the officer all he knew was he was hauling oranges from the west coast, he picked up his load from Sunkist Corporation in Fillmore, California, and the

trailer was already loaded. Defendant said he merely hooked up the tractor and headed out. The Ottawa police officer testified the defendant answered all of his questions but refused to cooperate with the police in terms of bringing the truck to New Jersey and following through with the delivery. *Ortiz*, 196 Ill. 2d at 244-46, 752 N.E.2d at 417.

¶ 44    The defendant testified he did not know any of the people the State had mentioned in its case in chief other than his friend, who was driving the other truck. Defendant testified his friend's truck was loaded before his and he did not observe the loading of either his friend's truck or his own. He only looked in the truck after it had been loaded to determine if the load was stable. *Ortiz*, 196 Ill. 2d at 246-47, 752 N.E.2d at 418. Defendant explained he was nervous when speaking to the trooper because his girlfriend was in the truck with him, no one was supposed to be with him, and he was worried he would be fined. *Ortiz*, 196 Ill. 2d at 248, 752 N.E.2d at 418. Defendant denied he knew about the secret compartment in the trailer. He also denied knowing he was hauling anything but oranges. *Ortiz*, 196 Ill. 2d at 248, 752 N.E.2d at 419.

¶ 45    The defendant's conviction was affirmed on appeal in an unpublished order. *Ortiz*, 196 Ill. 2d at 252, 752 N.E.2d at 421. Our supreme court granted defendant leave to appeal. *Ortiz*, 196 Ill. 2d at 252, 752 N.E.2d at 421. Defendant disputed the State proved his knowledge of the cocaine. *Ortiz*, 196 Ill. 2d at 258, 752 N.E.2d at 424. The State argued sufficient circumstantial evidence supported the defendant's conviction. *Ortiz*, 196 Ill. 2d at 259, 752 N.E.2d at 425.

¶ 46    The supreme court noted several pieces of uncontradicted evidence weighed in the defendant's favor. The court listed the trooper's testimony a truck driver would normally only check to see if his load was secure before driving; the diamond plate could not be seen from the rear of the truck after the truck was loaded; and, as a truck driver, he drove where he was told, with the load he was given, even if his employer was not making the best use of the truck. The court also noted the defendant gave the trooper permission to search his truck even though he was free to leave and told the police his friend was driving another truck on the same route. *Oritz*, 196 Ill. 2d at 259-60, 752 N.E.2d at 425.

¶ 47    However, the State relied on the following evidence in arguing the State proved defendant's guilt beyond a reasonable doubt: "(1) defendant's connection to other drug smugglers; (2) inconsistent and suspicious testimony by defendant; (3) the value of the cocaine; (4) the presence of two pagers in the cab of the truck; and (5) defendant's nervousness." *Ortiz*, 196 Ill. 2d at 260, 752 N.E.2d at 425.

¶ 48    The supreme court found the evidence presented at trial did not provide a basis for an inference defendant and the other smugglers were "intimately associated." *Ortiz*, 196 Ill. 2d at 261, 752 N.E.2d at 426. Further, the court noted the State did not establish defendant knew his friend's truck was also not fully loaded. As the supreme court noted, "the fact neither truck was full was one of the key pieces of evidence upon which the trial court relied in convicting the defendant." *Ortiz*, 196 Ill. 2d at 263, 752 N.E.2d at 427. According to the court, "[w]e cannot see any basis for imputing to this defendant knowledge that he was transporting narcotics based on the fact that he was driving less than a full load of perishable fresh produce to the east coast during winter." *Ortiz*, 196 Ill. 2d at 264, 752 N.E.2d at 428.

¶ 49 In addition, the supreme court stated "Trooper Balma admitted that when he, as a trucker, had believed that his employer was not making an efficient use of his truck or time, he still drove where he was told. It was simply not his job to question the economics of the trip he was being asked to take." *Ortiz*, 196 Ill. 2d at 265, 752 N.E.2d at 428. With regard to the value of the cocaine, the court noted the trial court made no mention of the value of the drugs in explaining its ruling. As for the two pagers, the supreme court noted the State provided no evidence to infer the large amount of cocaine found in the truck gave rise to an inference the two pagers were part of the drug business tools of the trade. *Ortiz*, 196 Ill. 2d at 265-66, 752 N.E.2d at 428. The court noted the State provided "no authority for this inference or any explanation as to how or why we should impute knowledge of the drugs to defendant because of the presence of the pagers," nor did it present any evidence impeaching or casting doubt on defendant's explanation for having two pagers in the truck. *Ortiz*, 196 Ill. 2d at 266, 752 N.E.2d at 428. The supreme court agreed with the State defendant's nervousness militates in favor of a finding he had knowledge of the drugs. *Ortiz*, 196 Ill. 2d at 266, 752 N.E.2d at 429. However, the State conceded defendant's nervousness "is not in and of itself sufficient to uphold such a finding." *Ortiz*, 196 Ill. 2d at 266-67, 752 N.E.2d at 429.

¶ 50 The supreme court stated:

"In a criminal case it is our duty to examine carefully the evidence adduced at trial. We must give due consideration to the fact that the fact finder saw and heard the witnesses. But '[i]f, after such consideration we are of the opinion that the evidence is not sufficient to establish defendant's guilt beyond a reasonable doubt, it is our duty to reverse the judgment of conviction.' [Citations.] '[A] judgment of conviction can be sustained only upon credible evidence that removes all reasonable doubt of guilt, and where the evidence of the prosecution is improbable, unconvincing or contrary to human experience, we will not hesitate to reverse' that conviction. [Citation.] We cannot sustain defendant's conviction on the evidence adduced in this case. The circumstantial evidence was scant at best, and appears even weaker in light of the evidence supporting a not guilty finding.

Of course, a fact finder need not accept the defendant's version of events as among competing versions. [Citation.] But in this case much of the evidence supporting defendant came not only from defendant, but from Trooper Balma, the State's own witness. He testified that a driver would normally do no more than check if the load was secure before driving, and acknowledged that the diamond plate panel could not be seen from the rear of the truck. Balma also testified that he did not make it his business, as a driver, to question the economics of a trip he was being paid to take, even when he did not think his employer was making the best possible use of the truck. Other facts indicative of defendant's innocence are wholly uncontradicted, *i.e.*, defendant's consent to the search and his telling the police that Colon was driving a truck on the same route." *Ortiz*, 196 Ill. 2d at 267-68, 752 N.E.2d at 429.

The evidence in the case *sub judice* is even weaker than the evidence in *Ortiz*. The State could have proved the knowledge element of this offense by introducing evidence defendant knew "Bulldog" contained the substance AM-2201, regardless of whether he knew AM-2201 was a controlled substance. See *People v. Izzo*, 195 Ill. 2d 109, 115, 745 N.E.2d 548, 552

-14-

(2001) ("A principle deeply embedded in our system of jurisprudence is that one's ignorance of the law does not excuse unlawful conduct."). However, the State introduced no evidence to support a finding defendant knew AM-2201 was in "Bulldog."

¶ 51　From the record, it does not appear the "Bulldog" packaging indicated it contained AM-2201. Even if it did, this would not automatically establish defendant knew the specific ingredients making up the product, considering this is not a natural product. Most people buying or selling a manufactured product in a convenience store have no idea what is in the product, unless they look at the ingredient label on the product.

¶ 52　The trial court did not specifically find defendant knew the "Bulldog" contained AM-2201, nor could the court have made this finding considering the evidence in this case. The State introduced no evidence of defendant's understanding of the specific ingredients used in the "Bulldog" product. As a result, both the State's and the trial court's focus on the legal proposition ignorance of the law is not an excuse was misplaced in this case.

¶ 53　The next question is whether the State established beyond a reasonable doubt defendant knew the "Bulldog" contained any controlled substance, regardless of his specific lack of knowledge of the presence of AM-2201. See *People v. Bolden*, 62 Ill. App. 3d 1009, 1013, 379 N.E.2d 912, 916 (1978) ("[I]t [is] not necessary for the State to prove that the defendant knew the precise nature of the controlled substance delivered."). Having reviewed the record in this case and considered all the evidence, not just the evidence supporting the State's theory of the case, we find a rational trier of fact could not have found beyond a reasonable doubt defendant knew the "Bulldog" contained any controlled substance.

¶ 54　"Knowledge may be, and ordinarily is, proven circumstantially." *Ortiz*, 196 Ill. 2d at 260, 752 N.E.2d at 425. However, suspicious behavior alone is not sufficient to establish a defendant knowingly possessed a controlled substance. *People v. Jackson*, 23 Ill. 2d 360, 363-64, 178 N.E.2d 320, 322 (1961).

¶ 55　Like in *Ortiz*, the State's witnesses provided evidence helpful to defendant. For example, State witnesses testified not all "spice" is illegal to sell. As a result, defendant's acknowledgment he knew "Bulldog" was "spice" is not very significant. Further, although defendant admitted he knew people smoked "spice," the State did not introduce any evidence only illegal "spice" is smoked. In addition, while the State tried to make an inference defendant knew people smoked "spice" to get high because his coworker, who also lived with defendant, thought people smoked "spice" to get high, the State did not introduce any evidence people only smoke illegal "spice" to get high.

¶ 56　Further, although Detective Tyler testified he was informed the gas station in question only sold illegal "spice" to prior customers or people they knew, the State presented no evidence Alex Cole, the State's confidential source, knew defendant or had ever purchased "spice" from defendant or the gas station. Yet, the evidence showed Cole was able to easily purchase "Bulldog" from defendant. Based on the information Tyler was acting on in investigating the suspected sale of illegal "spice" at the gas station, his confidential source should not have been able to purchase the product so easily. In addition, the State presented no evidence defendant acted suspiciously when he sold "Bulldog" to the confidential source. The State also did not introduce any evidence defendant was selective when he sold

-15-

"Bulldog."

¶ 57    Detective Tyler also testified he was suspicious defendant was selling "Bulldog" off the books because he did not give the confidential source a receipt. However, Tyler testified he did not tell the confidential source to get a receipt or ask the confidential source if he asked for a receipt. The undisputed evidence showed customers who bought "Bulldog" with cash were given a receipt if a receipt was requested. As a result, the relevance of the failure to give Cole a receipt is dramatically weakened.

¶ 58    In addition, the State presented no evidence to show this product was being sold off the books or defendant would only accept a cash payment for the "Bulldog." Evidence was introduced the gas station employees were logging each "Bulldog" purchase by scanning a bar code attached to the side of the cash register. Further, the marked money used by the confidential source to buy the "Bulldog" was not recovered by the police from either the store or defendant, even though the defendant was arrested and the gas station searched the same day of the sale in question. In other words, it appears the cash from sales of "Bulldog" went into the cash drawer of the register and most likely was handed out as change to other customers throughout the day.

¶ 59    Detective Tyler also assumed defendant owned the gas station. This was an incorrect assumption on his part. During his interrogation, defendant provided Tyler with the owner's name and phone number. While an owner or store manager would likely order stock for the store and determine how the stock would be displayed, the State failed to establish defendant had any role in ordering stock for the gas station or in deciding whether and where different items, including "Bulldog," would be displayed in the store. In the same manner a truck driver might question his employer's decision regarding his use of a truck but still follow the employer's decision, the same can be said for a store clerk's thoughts on a store owner's decision not to display certain products.

¶ 60    Detective Tyler also testified he did not know if the "Bulldog" was an illegal form of "spice" after his confidential source provided him with the container. The product was professionally packaged and, as stated earlier, the State did not introduce any evidence the ingredients were listed on the package. Considering a trained law enforcement officer was not able to identify whether the product was illegal "spice," it is difficult to determine how a minimum-wage employee would know it was illegal absent additional information. The State argued defendant had more information than Tyler with regard to the product, but the State fails to identify this additional information. The only additional evidence appears to be defendant asked the gas station owner if the "Bulldog" was legal to sell and the store owner assured him it was a legal product.

¶ 61    The trial court stated it believed defendant knew "Bulldog" contained a controlled substance. However, the evidence does not support this finding beyond a reasonable doubt. The evidence in this case only supports the following findings: (1) defendant knew he was selling a professionally packaged product its manufacturers or distributors called "Bulldog;" (2) defendant identified the product as "spice"; (3) defendant knew some people who purchased this product smoked the substance; (4) "Bulldog" was not on open display on the day in question; (5) "Bulldog" was not sold in the store for a period in January after certain

substances used in certain "spice" products were made illegal; and (6) defendant questioned the store owner whether "Bulldog" was legal to sell and was told yes and that the owner had a certificate so stating. These facts do not lead to an inference defendant knew he was selling a controlled substance.

¶ 62 As we stated earlier, the State's witnesses acknowledged not all "spice" is illegal to sell. Further, the State failed to establish people only smoke illegal "spice." Moreover, people buy legal products to use in an unintended manner to get high. The State failed to establish defendant made the decision to stock "Bulldog," the decision not to have "Bulldog" on public display, or the decision what other items the store would sell, such as the pipes sold at the gas station. The State did not establish defendant had any consciousness of guilt as to the sale of the "Bulldog."

¶ 63 Valid reasons exist for store owners or managers of stores catering to customers of all ages to keep certain legal products out of the public eye. Many people, especially parents, would prefer convenience stores and gas stations not display alcohol or cigarettes for the simple fact they neither want to see nor have their children exposed to these legal items. Out of respect for these customers' feelings, a store owner could decide to stock these items out of sight but still be readily available at the request of customers who might want to buy these legal products. A store owner could easily decide not to publicly display legal "spice" for the same reasons. Had defendant been working at a tobacco shop catering to an adult-only clientele, the fact "Bulldog" was not displayed might be more indicative of guilt, at least on the part of the person who decided not to display the product.

¶ 64 The State also established defendant knew the man who owned the gas station in question did not sell "spice" at another gas station he owned and defendant's nephew was no longer selling "spice" at the gas station he owned. However, this is no stronger evidence defendant knew "Bulldog" contained a controlled substance than the half empty truck established the defendant in *Ortiz* knew he was transporting cocaine. All gas stations do not sell the same products. Many factors impact what products individual stores will stock. The fact one store owner might decide to stop selling a product at one or all of his stores does not put employees of other stores on notice their sale of those products is illegal. For the same reasons, the fact the gas station in question did not stock "Bulldog" for a period of time after AM-2201 became illegal does not establish defendant either knew or should have known the product was illegal when the store began selling the product again. Further, in an apparent effort to make sure he was not selling anything illegal, defendant asked the store owner whether the "Bulldog" could be legally sold and received assurances from the store owner.

¶ 65 Considering the evidence in this case, a rational trier of fact could suspect defendant knew he was selling an illegal product. However, mere suspicion of wrongdoing is not proof beyond a reasonable doubt. The evidence in this case does not establish defendant knew "Bulldog" contained a controlled substance. As our supreme court has stated:

" 'What is involved here is the standard of proof which is applicable to all crimes. That is to say, conviction beyond a reasonable doubt. Whether the crime charged be trespass, shoplifting, armed robbery, or murder, the test is the same. The burden of meeting this standard falls solely on the prosecution. If it fails to meet this burden, a

-17-

defendant is entitled to a finding of not guilty. No defendant is required to prove his innocence.

> While a not guilty finding is sometimes equated with a finding of innocence, that conclusion is erroneous. Courts do not find people guilty or innocent. They find them guilty or not guilty. A not guilty verdict expresses no view as to a defendant's innocence. Rather, it indicates simply that the prosecution has failed to meet its burden of proof. While there are those who may criticize courts for turning criminals loose, courts have a duty to ensure that all citizens receive those rights which are applicable equally to every citizen who may find himself charged with a crime, whatever the crime and whatever the circumstances. When the State cannot meet its burden of proof, the defendant must go free. *** It is no help to speculate that the defendant may [be guilty]. No citizen would be safe from prosecution under such a standard.' " *Ortiz*, 196 Ill. 2d at 268, 752 N.E.2d at 430 (quoting *People v. Smith*, 185 Ill. 2d 532, 545-46, 708 N.E.2d 365, 371 (1999)).

The above-quoted language is particularly relevant in this case. The police and the State treated this case like a street-corner drug deal, where knowledge is easier to establish considering the controlled substance is usually not professionally packaged and is sold in a secretive manner for cash. This was certainly not the situation in this case. Defendant was a clerk at a gas station-convenience store selling hundreds if not thousands of legal products. This is not to say employees of a gas station, like the one in question, could never be convicted of selling illegal products. However, a trier of fact must consider all of the circumstances when determining whether a defendant knew he was selling a product containing a controlled substance. It is much more difficult to establish a worker selling a professionally packaged product from a convenience store, as compared to a street dealer, knew a product stocked by the store owner contained a controlled substance.

¶ 66    Although the extent of this court's knowledge about the investigation is limited to the information included in the record, the police officers did not develop a strong case against defendant. Detective Tyler made at least two incorrect assumptions during the investigation which potentially impacted the State's case against defendant. First, without asking his confidential source if he requested a receipt or telling him to ask for a receipt, Tyler assumed defendant was selling "Bulldog" off the books because his confidential source did not receive a receipt. Second, Tyler erroneously assumed defendant owned the convenience store.

¶ 67    Because we find the State failed to prove beyond a reasonable doubt the knowledge element of this offense, we need not address defendant's mistake of fact defense.

¶ 68                                III. CONCLUSION
¶ 69    For the reasons stated, we reverse defendant's conviction.


¶ 70    Reversed.