# Illinois Official Reports

## Appellate Court

---

***People v. Chatha*, 2015 IL App (4th) 130652**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KULDEEP CHATHA, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-13-0652 |
| Filed | May 29, 2015 |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 12-CF-204; the Hon. Scott Drazewski, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Michael J. Pelletier, of State Appellate Defender's Office, of Springfield, and Alan D. Goldberg and Carolyn R. Klarquist (argued), both of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Jason Chambers, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and Luke McNeill (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

Panel               JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices Knecht and Holder White concurred in the judgment and opinion.

## OPINION

¶ 1       In February 2012, a police confidential source purchased a commercially packaged product from a convenience store owned by defendant, Kuldeep Chatha. Forensic testing revealed that the product contained a lab-manufactured chemical compound–referred to as AM-2201–which mimics the effects of cannabis. The State later charged defendant with possession of a controlled substance with the intent to deliver (50 grams or more of a substance containing AM-2201 (synthetic cannabis) (1-(5-fluoropentyl)-3-(1-naphthoyl) indole) (720 ILCS 570/401(c)(11) (West 2010)).

¶ 2       Following a March 2013 bench trial, the trial court found defendant guilty. In July 2013, the court sentenced defendant to (1) jail for 180 days, which the court stayed; and (2) probation for 3 years.

¶ 3       Defendant appeals, arguing that the State failed to prove his guilt beyond a reasonable doubt. We agree and reverse.

¶ 4                      I. BACKGROUND

¶ 5                     A. The State's Charges

¶ 6       In March 2012, the State charged defendant with possession of a controlled substance with the intent to deliver. Specifically, the State alleged that defendant "knowingly *** possessed with the intent to deliver more than [50] grams of a substance containing AM-2201 (synthetic cannabis) (1-(5-fluoropentyl)-3-(1-naphthoyl) indole)."

¶ 7           B. The Evidence Presented at Defendant's March 2013 Bench Trial

¶ 8       At a March 2013 bench trial, the parties presented the following evidence.

¶ 9                    1. *The State's Evidence*

¶ 10       Alexander Cole testified that as the result of his earlier arrest for selling cannabis, in February 2012, he agreed to assist the police by becoming a confidential source. On February 23, 2012, Cole agreed to meet Tim Tyler, a McLean County sheriff, to conduct a "controlled buy." At that meeting, Tyler (1) searched Cole and his car to ensure the absence of money or contraband, (2) instructed Cole to drive to a gas station/convenience store owned by defendant to purchase "spice" marketed as "California Kush," and (3) provided Cole $40 in recorded bills for that purchase. Tyler directed Cole not to purchase California Kush if the store had it openly displayed for sale.

¶ 11       Cole followed Tyler to defendant's store, which was located just outside the city limits of Lexington, Illinois. After entering the store and confirming that the product was not openly

displayed, Cole asked the cash register clerk for California Kush. The clerk responded that the store did not stock that product, but he offered Cole what the clerk described as a similar product marketed as "Bulldog Potpourri." The clerk reached under the counter and handed Cole the product. Cole inspected the packaging and, after noticing that no other Bulldog Potpourri products were being displayed on the cash register counter, he agreed to the purchase. The clerk then scanned a bar code next to the cash register to begin the $27.74 transaction. Cole completed the sale but did not ask for a receipt. Cole then returned to Tyler and gave him the product and the remaining money. Cole acknowledged that a glass display case, which he recalled did not contain any Bulldog Potpourri, was located about four feet away from the left side of the cash register.

¶ 12    Tyler's testimony regarding the circumstances preceding Cole's February 23, 2012, purchase of Bulldog Potpourri was consistent with Cole's account. Tyler explained that from the time Cole arrived at defendant's store until the time he left, two police officers surveilled Cole from the store's parking lot. Afterward, Cole met Tyler at a nearby highway ramp and gave Tyler the Bulldog Potpourri and remaining money. Tyler performed a second search of Cole and his car to ensure that Cole did not retain any product or money. Thereafter, Cole left in his vehicle, and Tyler returned to the sheriff's department to secure the Bulldog Potpourri into evidence.

¶ 13    That afternoon, an evidence technician transported the Bulldog Potpourri to the Illinois State Police crime lab for analysis. Tyler testified that effective January 1, 2012, the legislature changed Illinois law to make "some chemicals that were contained in some [s]pice products illegal." Hours later, the crime lab informed Tyler that the Bulldog Potpourri contained AM-2201, which Illinois law classified as a controlled substance. Tyler then obtained a search warrant for defendant's store, which he and several other officers executed that evening.

¶ 14    During the search of defendant's store, police seized the following amounts of Bulldog Potpourri: (1) 6 jars on the counter near the register, (2) 33 jars in an open box underneath the counter, (3) 2 additional unopened boxes underneath the counter, (4) 5 jars on top of the store safe, and (5) 2 unopened boxes in a locked back office. (A photographic exhibit admitted into evidence showed that each unopened box held 64 jars of Bulldog Potpourri.)

¶ 15    Tyler explained that approximately 30 minutes after he executed the search warrant, he left the officers that were searching defendant's store and returned to the police station. Tyler called defendant and asked him to come to the police station for an interview. Defendant agreed, arriving at the station sometime before 9 p.m. that evening. The videotaped interview, which the trial court viewed, showed the following.

¶ 16    Defendant stated that he owned two gas station/convenience stores, located in Lexington and Morris, Illinois. Defendant acknowledged that because of a change in the law, he discontinued selling certain products, effective December 31, 2011. Thereafter, numerous customers at his Lexington store inquired why defendant did not sell Bulldog Potpourri, which they claimed was being sold by a tobacco store in Bloomington, Illinois. Customers asked defendant to stock the product so that they would not have to drive to Bloomington. At defendant's request, a customer provided him (1) samples of the product and (2) the telephone number of the tobacco store from which it was purchased. Defendant called the number, and the person responding confirmed that the store was selling Bulldog Potpourri. Based on that conversation, defendant "thought it might be legal."

¶ 17    Defendant stated that his supplier, Mohammed, informed him that Bulldog Potpourri was "natural incense" that was "100% lab tested" and did not contain any "synthetic drug." (The record does not reveal the supplier's full name.) Mohammed provided defendant a lab report purporting to show that Bulldog Potpourri did not contain any illegal substances. Based on Mohammed's representations, in February 2012, defendant began selling Bulldog Potpourri in his Lexington store. Acknowledging that some of his customers smoked Bulldog Potpourri, defendant stated he had a strict policy against selling that product to minors. Defendant averred that if he had known that the product was illegal, he would not have sold it. Defendant did not sell Bulldog Potpourri from his Morris store because a city ordinance prohibited such sales.

¶ 18    During the interview, Tyler informed defendant of the crime lab test results. Defendant reiterated that if he had known, he would not have sold Bulldog Potpourri. When Tyler suggested that defendant was "hiding" the Bulldog Potpourri by not displaying it openly, defendant stated that he informed his employees to display the product in the glass case located on the cash register counter. Defendant claimed that a container of Bulldog Potpourri was displayed in the glass case, acknowledging that if he was incorrect, it was likely that the product in the glass case had been sold and not yet restocked. Defendant stated that he kept a supply of Bulldog Potpourri under the counter so that his sole store clerks working their respective shifts would not have to walk back and forth from the glass display case each time a customer requested the product. Defendant denied that he knew Bulldog Potpourri contained a controlled substance.

¶ 19    A few days after his interview, defendant provided Tyler a correspondence dated January 9, 2012, signed by an "authorized representative" of S.A. Wholesale, LLC, which contained the following information:

"S.A. Wholesale, LLC (and Partners) only sell and distribute AROMATHERAPY products and are for fragrance purposes only, they are **NOT TO BE USED IN ANY OTHER WAY**. Our company, distributors, and retailers ARE NOT responsible for the misuse of any of our products.

These products **DO NOT** contain any of the following substances listed on Illinois [House Bill (HB)] 2089 (Public Act 097-0193) and (or) HB 2595 (Public Act 097-0192)[.]

**DOES NOT CONTAIN**: JWH-018, JWH-073, AM-694, CP 47, 97, HU-210, HU-211, JWH-015, JWH-081, JWH-122, JWH-251, RCS-8, BTW-8, and SR-18.

If you have any further question regarding our line of AROMATHERAPY products[,] please refer to the attached lab reports and if necessary[,] please consult with your local or state representatives.

OUR BRANDS ARE:

California 10X, Bulldog, Diesel, PANDORA, and Four Elements." (Emphases in original.)

(Although the aforementioned letter was signed on January 12, 2012, under the heading, "Authorized Representative," the signature was illegible. The letter did not further identify the signer.) Tyler noted that the attached lab report referenced in the corporation's letter analyzed a product marketed as "California Kronic" instead of Bulldog Potpourri.

¶ 20    Tyler defined the term "spice" as a "synthetic cannabinoid," explaining that he applied that descriptor to Bulldog Potpourri in a generic sense. Tyler compared his use of the term "spice"

or "weed" to describe cannabis to the term "crack" or "coke" to describe cocaine. Tyler admitted that neither he nor a member of the general public could determine through sight or smell that Bulldog Potpourri contained AM-2201.

¶ 21    Kerry Nielsen, a forensic scientist employed by the Illinois State Police, testified that on August 10, 2012, he took possession of a box containing "plant material" packaged in approximately 60 plastic containers with screw-top lids that the police had seized from defendant's store. Each of the containers had an affixed label that conveyed the following information: (1) the product's marketing name, "Bulldog Potpourri"; (2) the phrase "lab certified"; (3) the claim that the product "does not contain any illegal substances"; and (4) warnings that the product (a) was "not for human consumption" and (b) should be "[kept] out of reach from children."

¶ 22    Nielsen weighed and scientifically analyzed the plant material from 12 of the containers "on a molecular level." Based on that analysis, Nielsen (1) determined that the collective weight of the plant material was 58.4 grams and (2) concluded each of the 12 samples tested positive for the presence of the chemical compound AM-2201. Nielsen explained that AM-2201 is a lab-manufactured substance that mimics the effects of ingesting cannabis. Nielsen agreed that absent specialized scientific testing equipment–which was not available to the general public–a person would not be able to know by sight alone whether the plant material police seized from defendant's store contained AM-2201.

¶ 23                                            2. *Defendant's Evidence*

¶ 24    Defendant testified that he owned two gas stations, located in Lexington and Morris. Defendant travelled twice a week from his home in Naperville, Illinois, to his Lexington gas station to perform accounting duties that he estimated took him an hour to perform. Defendant explained that prior to January 2012, he sold incense in both his stores. In December 2011, defendant stopped selling that incense after finding out from a friend that the product was "going to be illegal." Defendant elaborated that he believed the incense was banned because it was determined to be a synthetic drug. Defendant acknowledged that he did not know what substance in the incense had been banned.

¶ 25    In January 2012, defendant's supplier, Mohammed–who had been supplying defendant's stores with various clothing items–informed defendant that he had a new, legal product called Bulldog Potpourri. Defendant told Mohammed that he was not interested in selling the potpourri. Sometime thereafter, defendant was at his Lexington store when a customer inquired why defendant did not sell Bulldog Potpourri. The customer elaborated that a Bloomington store called "The Smoker's Den" had been selling the product, which caught defendant's interest. Defendant gave the customer money and asked him to (1) purchase the product and (2) provide the telephone number of the tobacco store, which the customer later did. Defendant called The Smoker's Den and confirmed that the tobacco store was selling Bulldog Potpourri.

¶ 26    Mohammed later contacted defendant to inquire again about the Bulldog Potpourri. Mohammed assured defendant that the potpourri was a natural legal product and later provided defendant a lab report to verify that claim. When defendant inquired why the test results were based on a product called California Kronic, Mohammed told defendant that California Kronic and Bulldog Potpourri were the same product marketed under different brand names.

¶ 27    In February 2012, defendant began selling Bulldog Potpourri at his Lexington store. Defendant did not offer Bulldog Potpourri at his Morris store, explaining that in October 2011, a Morris police officer distributed a letter to local businesses informing them that effective November 2011, a new city ordinance prohibited the sale of "incense" and "potpourri." Defendant noted that a glass case located next to the cash register of his Lexington store displayed numerous items such as toys, flasks, cigarettes, incense, shot glasses, and "potpourri," but the police did not take pictures of that case during their search. Defendant explained that he displayed those items (1) to entice sales and (2) so that his sole shift employee would not have to "run back and forth." Defendant reiterated that if he had known that Bulldog Potpourri contained banned chemicals, he would not have sold that product.

¶ 28                         C. The Trial Court's Judgment

¶ 29    After considering the parties' closing arguments, the trial court provided the following rationale for finding defendant guilty of knowingly possessing with the intent to deliver more than 50 grams of a substance containing AM-2201 (synthetic cannabis) (1-(5-fluoropentyl)-3-(1-naphthoyl) indole):

> "The real question here *** is what knowledge or *scienter* needs to be established with respect to the controlled substance, as it was determined to be in [defendant's] store and whether or not based upon that knowledge both as far as a *scienter* requirement, as far as what the evidence is that demonstrated whether or not that is sufficient to meet the State's burden of proof of beyond a reasonable doubt. So an individual charged with a crime has requisite knowledge if the facts indicate [he] had an awareness of the substantial probability of a material fact.
>
>                                    * * *
>
> What the State has indicated in its argument as it relates to what facts or factors would support the circumstantial evidence to indicate defendant had requisite knowledge that he was in possession of a substance that was a controlled substance, and that he had knowledge was a number of things primarily *** that [defendant] knew that people smoke the Bulldog Spice; that he didn't sell it to anyone under the age of 18; that *** defendant[ ] had sold similar type products, that [defendant] had sold similar type products, that he referred to it as a synthetic drug[,] and he was aware that other types of similar items became banned in December of 2011. [Defendant] mistakenly believed that the items were legal; however, he based his decision to sell the Bulldog based on a lab report given to him by [S.A.] Wholesaler[s], a company based in California. And as noted on that *** report, although there is some knowledge by *** defendant as it relates to an indication that a product that was tested by S.A. Wholesalers was legal in the State of Illinois, it was for the product California Kronic and not Bulldog Spice, which was the item that *** defendant was in possession of and sold. It's also understandable that the defendant not having the background and knowledge and experience that being either in chemistry or in the sciences, that he wouldn't understand the lab reports. But even reading the lab report for its face value, it does indicate that California Kronic was tested, not Bulldog Spice.
>
> In addition, the defendant's behaviors were not consistent with the sale of a legal product. And that would relate to the fact that the Bulldog was primarily, not exclusively, hidden from customers, primarily where it was located under the register;

the fact that individuals must request it from the cashier; the fact that for a small jar of product they were charging $27, and also I think by inference the attitude that was taken by *** defendant which is, okay, I'm aware that the change in the law took effect on January 1st, 2012, and so I've got two options ***; one, I could go ahead and say that I'm not going to sell this product until I know that it's legal; or he could *** say I'm going to *** sell it until I find it's illegal. And we know he opted for the latter as opposed to the former. There was some risk taken there as well.

*** 

It's not reasonable to assume that the legislature intended that the State prove that the accused knew the exact nature or chemical name of the controlled substance. This would lead to the absurd result *** that drug dealers would only be liable for selling the drug they thought they were selling. This approach would make the statute inapplicable to one who had not personally performed a chemical analysis of the substance containing the controlled substance. So we know that that is not what [defendant] did, nor is that what is required in order to have knowledge in essence construed to him. The only knowledge in order to find someone guilty is *** defendant's knowledge or belief that the substance was a controlled or prohibited substance. The State isn't required to prove *** defendant knew the exact nature or precise chemical name of the substance.

From that perspective, [the court is] looking at the *** primarily circumstantial evidence that the defendant engaged in a conscious or willful ignorance in essence of this product being legal or illegal, hear no evil; see no evil. And the law, although not being strict liability, would indicate that knowledge, albeit by way of circumstantial evidence and demonstrated by the State in this case, can and will rise to the level of meeting the State's burden of proof beyond a reasonable doubt."

¶ 30    In July 2013, the trial court sentenced defendant as previously noted.

¶ 31    This appeal followed.

¶ 32                          II. SUFFICIENCY OF THE EVIDENCE
¶ 33                        A. The Pertinent Statutory Sections at Issue
¶ 34    Section 401 of the Illinois Controlled Substances Act (Act) provides, as follows:

"Except as authorized by this Act, it is unlawful for any person knowingly to manufacture or deliver, or possess with intent to manufacture or deliver, a controlled substance other than methamphetamine, a counterfeit substance, or a controlled substance analog." 720 ILCS 570/401 (West 2010).

¶ 35    Section 401(c)(11) of the Act, the statutory provision defendant was convicted of violating, provides, as follows:

"(c) Any person who violates this [s]ection with regard to the following amounts of controlled or counterfeit substances or controlled substance analogs *** is guilty of a Class 1 felony. The fine for violation of this subsection (c) shall not be more than $250,000:

* * *

(11) 50 grams or more but less than 200 grams of any substance containing a substance classified in Schedules I or II, or an analog thereof, which is not otherwise included in this subsection." 720 ILCS 570/401(c)(11) (West 2010).

¶ 36    Section 204(d) of the Act, which identifies the controlled substances listed under Schedule I, provides, as follows:

"Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of the following hallucinogenic substances, or which contains any of its salts, isomers and salts of isomers, whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation (for the purposes of this paragraph only, the term 'isomer' includes the optical, position and geometric isomers)[.]" 720 ILCS 570/204(d) (West 2010).

¶ 37    In Public Act 97-193, the legislature amended section 204(d) of the Act by adding section 204(d)(33), the controlled substance at issue in this case, as follows:

"(33) Any compound structurally derived from 3- (1-naphthoyl) indole or 1H-indol-3-yl- (1-naphthyl) methane by substitution at the nitrogen atom of the indole ring by alkyl, haloalkyl, alkenyl, cycloalkylmethyl, cycloalkylethyl or 2- (4-morpholinyl) ethyl whether or not further substituted in the indole ring to any extent ***[.]" Pub. Act 97-193 (eff. Jan. 1, 2012) (adding 720 ILCS 570/204(d)(33)).

(We note that the legislature, apparently never resting, has since amended section 204(d) further, to include additional chemical compounds it has now classified as controlled substances. In so doing, the aforementioned section enacted by Public Act 97-193 now appears as section 204(d)(42) of the Act. See 720 ILCS 570/204(d)(42) (West 2012).)

¶ 38                            B. The Standard of Review

¶ 39    "When considering a challenge to the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the required elements of the crime beyond a reasonable doubt." *People v. Gonzalez*, 239 Ill. 2d 471, 478, 942 N.E.2d 1246, 1250 (2011). "Generally, the trier of fact has had the opportunity to hear and see the witnesses and, for that reason, is in the best position to judge credibility." *People v. Austin M.*, 2012 IL 111194, ¶ 107, 975 N.E.2d 22. The burden to prove a defendant's guilt beyond a reasonable doubt rests solely upon the State. *In re Vuk R.*, 2013 IL App (1st) 132506, ¶ 7, 2 N.E.3d 1083. A reviewing court will affirm a conviction if credible evidence removes all reasonable doubt as to the defendant's guilt. *Id.* A conviction based on evidence that is improbable, unconvincing, or contrary to human experience requires reversal. *People v. Ortiz*, 196 Ill. 2d 236, 267, 752 N.E.2d 410, 429 (2001).

¶ 40                            C. Defendant's Claim

¶ 41    "In order to convict a defendant of possession of a controlled substance with intent to deliver, the State must prove the defendant (1) had knowledge of the presence of the narcotics, (2) had possession or control of the narcotics[,] and (3) intended to deliver the narcotics." *People v. Blakney*, 375 Ill. App. 3d 554, 557, 873 N.E.2d 1007, 1010 (2007).

¶ 42    Our analysis begins by noting what is not at issue in this case. On this record, it is undisputed that defendant sold a commercially packaged product marketed as Bulldog Potpourri from his Lexington convenience store. It is also undisputed that the potpourri defendant sold contained a controlled substance–namely the chemical compound

"1-(5-fluoropentyl)-3-(1-naphthoyl) indole)" referred to as AM-2201. However, "[a] defendant cannot be convicted simply because he sold a product containing a controlled substance." *People v. Patel*, 2013 IL App (4th) 121111, ¶ 33, 996 N.E.2d 1114. As properly framed by the parties and the trial court, the only issue before us concerns defendant's knowledge. Specifically, whether the evidence before the court–acting as the trier of fact–was sufficient for any rational trier of fact to find that defendant knew the Bulldog Potpourri he possessed and sold contained a controlled substance. The court found that the State presented sufficient circumstantial evidence to prove this element beyond a reasonable doubt. See *Ortiz*, 196 Ill. 2d at 260, 752 N.E.2d at 425 ("Knowledge may be, and ordinarily is, proven circumstantially."). We disagree.

¶ 43    We earlier quoted a portion of Public Act 97-193, which amended section 204(d) of the Act by adding then-section 204(d)(33) (now codified as section 204(d)(42) of the Act), the controlled substance at issue in this case, as follows:

> "(33) Any compound structurally derived from 3- (1-naphthoyl) indole or 1H-indol-3-yl- (1-naphthyl) methane by substitution at the nitrogen atom of the indole ring by alkyl, haloalkyl, alkenyl, cycloalkylmethyl, cycloalkylethyl or 2- (4-morpholinyl) ethyl whether or not further substituted in the indole ring to any extent ***[.]" Pub. Act 97-193 (eff. Jan. 1, 2012) (adding 720 ILCS 570/204(d)(33)).

¶ 44    In that same public act, the legislature added section 204(d)(34) (now codified as section 204(d)(43) of the Act), which also prohibited the following controlled substance:

> "(34) Any compound structurally derived from 3- (1-naphthoyl) pyrrole by substitution at the nitrogen atom of the pyrrole ring by alkyl, haloalkyl, alkenyl, cycloalkylmethyl, cycloalkylethyl or 2- (4-morpholinyl) ethyl, whether or not further substituted in the pyrrole ring to any extent, whether or not substituted in the naphthyl ring to any extent[.]" Pub. Act 97-193 (eff. Jan. 1, 2012) (adding 720 ILCS 570/204(d)(34)).

¶ 45    The aforementioned statutory revisions highlight the challenges posed in criminalizing a lab-manufactured chemical substance by identifying its molecular composition. First, we doubt that anyone without an advanced degree in chemistry could articulate intelligently the differences between the two aforementioned controlled substances, much less identify with certainty the specific controlled substances if they were shown in their raw form. Second, given that these lab-manufactured controlled substances can likely be applied to any legal product, only scientific testing can confirm their presence.

¶ 46    Because the State will almost never be able to prove that someone in defendant's position *knowingly* possessed the *specific* chemical substance at issue, the most the State can hope to prove is that the accused knowingly possessed something that could be ingested for its intoxicating effects. This was essentially the extent of the State's proof in this case. The obvious problem with this method of proving criminal liability is that the legislature has not seen fit to impose a blanket ban on the ingestion of substances for their intoxicating effects. As the ever-expanding list of illegal chemical substances demonstrates, many chemical substances experience a period after they have been developed, marketed, and distributed to the masses, but before the legislature has criminalized them.

¶ 47    For example, at the time defendant received the shipment of Bulldog Potpourri, the chemical compound known as "4-iodo-2, 5-dimethoxy-N- ((2-methoxy phenyl) methyl) - benzeneethanamine" was perfectly legal in Illinois. See Pub. Act 98-987, § 5 (eff. Jan. 1, 2015)

(amending 720 ILCS 570/204 (West 2012)). The average lay person would have no way of knowing what such a substance looked or smelled like, or how it was packaged, marketed, sold, or ingested. From defendant's perspective, based upon his inquiry to the manufacturer, Bulldog Potpourri probably contained some *legal* chemical substance that his customers enjoyed smoking for its intoxicating effects. Indeed, if Bulldog Potpourri had simply contained 4-iodo-2,5-dimethoxy-N-((2-methoxy phenyl)methyl)-benzeneethanamine–instead of a compound structurally derived from 3-(1-naphthoyl)indole or 1H-indol-3-yl-(1-naphthoyl)methane by substitution at the nitrogen atom of the indole ring by alkyl, haloalkyl, alkenyl, cycloalkylmethyl, cycloalkylethyl or 2-(4-morpholinyl)ethyl whether or not further substituted in the indole ring to any extent–it would have been perfectly legal for defendant to sell it from his store in 2012. This illustrates the near impossibility of proving *knowing possession* in cases involving such lab-manufactured chemicals.

¶ 48    In *Patel*, 2013 IL App (4th) 121111, ¶ 1, 996 N.E.2d 1114, this court considered the sufficiency of the evidence the State presented to convict the store clerk that sold the Bulldog Potpourri to Cole. In reversing the store clerk's conviction for delivery of a controlled substance (substance containing AM-2201 (synthetic cannabis)) (1-(5-fluoropentyl)-3-(1-naphthoyl) indole) (720 ILCS 570/401(e) (West 2010)), we noted the following:

> "The police and the State treated this case like a street-corner drug deal, where knowledge is easier to establish considering the controlled substance is usually not professionally packaged and is sold in a secretive manner for cash. This was certainly not the situation in this case. Defendant was a clerk at a gas station-convenience store selling hundreds if not thousands of legal products. This is not to say employees of a gas station, like the one in question, could never be convicted of selling illegal products. However, a trier of fact must consider all of the circumstances when determining whether a defendant knew he was selling a product containing a controlled substance. It is much more difficult to establish a worker selling a professionally packaged product from a convenience store, as compared to a street dealer, knew a product stocked by the store owner contained a controlled substance." *Patel*, 2013 IL App (4th) 121111, ¶ 65, 996 N.E.2d 1114.

¶ 49    Our analysis in *Patel* is equally applicable to the facts presented in the instant case. The issue of whether defendant–as the store owner–knew that the commercially packaged plant material he stocked and sold contained the addition of a nonorganic controlled substance defined by its molecular composition is distinctly more complicated and difficult to prove beyond a reasonable doubt than an analysis concerning the typical street-corner exchange of money for cannabis in which the controlled substance organically derives from the plant material at issue. See 720 ILCS 550/3(a) (West 2010) (defining cannabis, in part, as including "tetrahydrocannabinol (THC) and all other cannabinol derivatives"). In both scenarios, however, the analysis concerning the defendant's knowledge "must include consideration of all of the evidence, not just the evidence convenient to the State's theory of the case." *People v. Wheeler*, 226 Ill. 2d 92, 117, 871 N.E.2d 728, 742 (2007).

¶ 50    In support of its verdict, the trial court specifically noted the following circumstantial evidence: (1) defendant knew some of his customers smoked Bulldog Spice; (2) defendant did not sell Bulldog Spice to anyone under 18 years of age; (3) the Bulldog Potpourri was "primarily, [but] not exclusively, hidden from customers"; (4) defendant "had sold similar type products that he referred to as a synthetic drug"; (5) defendant was aware that in December

- 10 -

2011, "other types of similar items" were banned; and (6) the cost of the Bulldog Potpourri was approximately $27. The court deduced from this circumstantial evidence that defendant "engaged in a conscious and willful ignorance" regarding the legality of Bulldog Potpourri.

¶ 51    In this case, the evidence presented showed the following: (1) in December 2011, defendant discontinued the sale of a specific incense product from his Lexington store because that product had been banned; (2) in January 2012, defendant was approached by his supplier to stock a new product marketed as Bulldog Potpourri, which defendant initially declined; (3) in February 2012, defendant began selling Bulldog Potpourri based on (a) another store's sales of that product, (b) a laboratory report showing that a supposedly identical product did not contain any illegal substances, and (c) his supplier's representation that Bulldog Potpourri was legal; (4) defendant knew some customers smoked the Bulldog Potpourri; and (5) on February 23, 2013, defendant did not openly display Bulldog Potpourri in his store. The State did not even attempt to present any evidence that defendant had even heard of the chemical compound AM-2201 before his arrest for knowingly possessing that substance with the intent to deliver.

¶ 52    We first reject the notion that defendant's knowledge concerning how some of his customers misused Bulldog Potpourri is circumstantial evidence showing defendant knew that specific product contained a controlled substance. The revelation that adults and minors will misuse a product–offered for a specific legal purpose–by ingesting it to alter their mood does not necessarily mean that the product contains a specific banned substance. Defendant's admission that he knew customers smoked Bulldog Potpourri does not put him on notice that the product was presumptively illegal anymore than–for example–a purveyor's knowledge that his customers were buying oranges intending to smoke the peels should lead to the conclusion that the oranges contained a controlled substance. We note that during his interview with Tyler, defendant stated that his knowledge regarding the product's misuse prompted his store policy banning the sale of Bulldog Potpourri to minors.

¶ 53    We also note that the State presented evidence showing that on February 23, 2012, defendant did not display Bulldog Potpourri openly, which the State claimed provided circumstantial evidence of defendant's knowledge that the product contained a controlled substance–a claim defendant disputed. Our analysis of defendant's actions and demeanor before and after police began their investigation militates against the State's claim.

¶ 54    Here, the uncontroverted evidence presented showed that before February 23, 2012, defendant willingly complied with applicable laws and ordinances and demonstrated his concern about the legality of the products offered in his stores. Specifically, (1) in November 2011, defendant complied with a Morris city ordinance that prohibited the sale of "incense" and "potpourri" at his Morris store; (2) in December 2011, defendant discontinued selling the incense that the legislature banned; and (3) during January 2012, defendant investigated Bulldog Potpourri to assuage his concerns before offering that product to the public. Although a trier of fact may question the effectiveness of defendant's investigation concerning whether Bulldog Potpourri contained a controlled substance, as we have already noted, absent scientific testing, defendant could not conclusively determine whether the otherwise legal potpourri contained a controlled substance. We disagree with the trial court's characterization that defendant's actions showed he "engaged in a conscious or willful ignorance" regarding the legality of the product.

¶ 55    Defendant's demeanor also demonstrated his willingness to comply with the requests levied by Tyler during his investigation, which included (1) travelling on short notice to

comply with Tyler's interview request, in which defendant answered all of Tyler's questions; and (2) later providing Tyler further documentation regarding representations he made during that interview. Under these circumstances, defendant's actions and willing cooperation buttressed his steadfast insistence that if he had known the Bulldog Potpourri contained a controlled substance, he would have stopped selling the product. At best, the State's evidence suggested that defendant knew Bulldog Potpourri was packaged and marketed similarly to products containing substances the legislature had previously banned. However, that evidence was insufficient to establish beyond a reasonable doubt that defendant knew Bulldog Potpourri contained AM-2201. Accordingly, we reverse defendant's conviction and sentence.

¶ 56                                    III. CONCLUSION

¶ 57        For the reasons stated, we reverse the trial court's judgment.

¶ 58        Reversed.