# Illinois Official Reports

## Appellate Court

---

### *People v. Monteleone*, 2018 IL App (2d) 170150

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN G. MONTELEONE, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-17-0150 |
| Filed | June 28, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 13-CF-1891; the Hon. Linda S. Abrahamson, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Richard Dvorak and Christopher A. Tinsley, of Dvorak Law Offices, LLC, of Willowbrook, for appellant.<br><br>Joseph H. McMahon, State's Attorney, of St. Charles (Patrick Delfino, David J. Robinson, and David A. Bernhard, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE BURKE delivered the judgment of the court, with opinion. Justices Hutchinson and Jorgensen concurred in the judgment and opinion. |

**OPINION**

¶ 1        On three separate occasions beginning in July 2013, an undercover police officer purchased commercially packaged products, known as "Mary Joy" and "Mary Joy Dead and Berried," from the King Puff-N-Stuff smoke shop owned by defendant, John G. Monteleone. The ingredient list on the packages did not include any illegal substances, but lab results revealed that the products contained lab-manufactured chemical compounds frequently referred to as synthetic cannabinoids, which are illegal controlled substances. The State charged defendant by indictment with several counts, and following a bench trial, defendant was found guilty of six counts. Defendant appeals his convictions of delivery of a controlled substance and unlawful possession with intent to deliver a controlled substance. To convict a defendant of these offenses, the State must prove, *inter alia*, that the defendant knew that the substance was illegal. Defendant admits that he possessed and sold the products, but he contends that the State failed to prove beyond a reasonable doubt that he knew that the products contained an illegal substance. We affirm.

¶ 2                                          I. FACTS

¶ 3        Defendant's charges included three counts of delivery of a controlled substance (counts V, VI, and VII), two counts of possession with intent to deliver a controlled substance (counts I and III), two counts of possession of a controlled substance (counts II and IV), one count of possession of cannabis (count VIII), and one count of possession of drug paraphernalia (count IX). Except for counts VIII and IX, the counts alleged that defendant sold and possessed an amount of a "substance containing 1-Pentyl-3-(2,2,3,3 tetramethylcyclopropyl) indole (UR-144), 1-(5-fluoropentyl)-3-(2,2,3,3 tetramethylcyclopropoyl) indole (XLR-11), a controlled substance analog that has a chemical structure substantially similar to that of the controlled substance JWH-018." See 720 ILCS 550/4(b) (West 2012); 720 ILCS 570/401(a)(11), (c)(11), (d), 402(a)(11), (c) (West 2012); 720 ILCS 600/3.5(a) (West 2012).

¶ 4        The following relevant facts were taken from the trial. Scott Torkleson, the undercover police officer, entered defendant's store on July 16, 2013. The store displayed digital scales, smoking pipes, bongs, vaporizers, and tobacco products in glass cases and on the walls. Torkleson asked if defendant had any Mary Joy for sale. Defendant responded that he did and that another person, who had just entered the store, also was there to purchase Mary Joy. Defendant went to an office in the back of the store for a few minutes and then called the other person to the office. After a short period, that person left the store, carrying cash in his hand. Defendant then called Torkleson to the office. Defendant showed him a small green and purple package labeled "Mary Joy" and told Torkleson that it would cost $15. Torkleson paid defendant with a $20 bill. Defendant did not use the cash register or give Torkleson a receipt. Torkleson asked if he could return and buy more if he liked it, and defendant responded "absolutely." Defendant gave him a business card on his way out.

¶ 5        Torkleson later called defendant and told him that he wanted to purchase more Mary Joy, and defendant said that he would meet him at the store. When Torkleson returned to the store, on July 25, 2013, defendant stated that he had only one package of Mary Joy but that he also had Mary Joy Dead and Berried. Defendant told Torkleson that he should be careful with it because it was very strong; that it would "knock him on his ass." Defendant and Torkleson walked to the back office. Torkleson saw defendant take the Mary Joy and the Dead and

Berried out of an open safe that contained money. Torkleson then purchased the two packages from defendant, with cash. As before, defendant did not ring up the purchase or give Torkleson a receipt. Before he left, Torkleson asked defendant about purchasing cannabis, and defendant said that he could take care of him.

¶ 6    On September 19, 2013, Torkleson conducted another undercover buy from defendant. When he entered the store, defendant asked if he was there to purchase some Mary Joy. Torkleson said yes and they went to the back office. Torkleson saw defendant take the Mary Joy out of the safe before he handed it to him. Defendant did not ring up the $15 purchase or give Torkleson a receipt. Torkleson never saw Mary Joy displayed or advertised in the public area of the store.

¶ 7    Torkleson testified that, based on his training, he knew that none of the ingredients listed on the back of the Mary Joy package was an illegal substance. The ingredient list for Dead and Berried was identical to that for Mary Joy. The package itself was a manufactured container, not a Baggie.

¶ 8    Virgil Schroeder, a master sergeant with the Illinois State Police, testified that on September 25, 2013, search and arrest warrants were served on defendant in his store. Defendant gave Schroeder the combination to his safe and told him that there was some "Spice" in it. "Spice" is a generic term for various synthetic cannabinoids. Schroeder found two plastic bag bundles containing both types of Mary Joy in the safe. He found no other packages of either kind of Mary Joy in the rest of the store. He did find a pipe that appeared to have been used to smoke some kind of substance. When Schroeder went to defendant's residence, he saw defendant's wife, Tracy, in her car and noticed two large overflowing tubs of Mary Joy and Dead and Berried in her back seat. In total, there were 3295 packages of Mary Joy.

¶ 9    Master Sergeant William Backus assisted in executing the warrant. Defendant told him "I no longer sell drugs here anymore. I just have a little weed." Another officer searched defendant and found a small amount of cannabis.

¶ 10    Sara Anderson, a forensic drug chemistry expert who worked at the Illinois State Police forensic science laboratory, received a bag of plant material on August 6, 2013. Using several techniques, including a gas chromatograph mass spectrometer, she determined that the plant material contained XLR-11 and UR-144. It did not contain JWH-018.

¶ 11    Martin Skelcy, another forensic drug chemistry expert employed by the Illinois State Police, analyzed the material and found that it contained XLR-11 and UR-144. He also weighed and tested the bin full of Mary Joy packages. The bin contained 209 grams of Mary Joy, and the plant material in the packages contained XLR-11 and UR-144.

¶ 12    Greg Endres, who was qualified as an expert in the field of medicinal and forensic chemistry, identified chemical diagrams of both tetrahydrocannabinol (THC), the active ingredient in cannabis, and JWH-018. JWH-018's structure has some similarity to THC, primarily because it binds to cannabinoid receptors in the human body. This binding is responsible for the psychotropic effects of cannabis and synthetic cannabinoids. Synthetic cannabinoids have more serious adverse effects on the body and tend to continually increase in effect with dosage. "K2" and "Spice" are two early and predominant brand names of an herbal mixture that has been sprayed with synthetic cannabinoids. Endres noted that synthetic cannabinoids have dozens of brand names, which are constantly changing. He frequently referred to all synthetic cannabinoids as K2. He also noted that new, slightly distinct

compounds are designed and marketed to avoid criminal liability. Endres concluded that UR-144 and XLR-11 are substantially similar to JWH-018, falling within the same subclassification of indole-based synthetic cannabinoids. In drug-discrimination tests, mice were not able to discriminate between XLR-11 or UR-144 and THC or JWH-018. He testified that, within a reasonable degree of scientific certainty, XLR-11 and UR-144 are analogs of JWH-018. Endres testified that new synthetic cannabinoids are created by chemists to be similar to existing ones but not specifically banned by statute. XLR-11 and UR-144 were not specifically banned by federal statute until May 2013. Under Illinois law, they are illegal based on the analog statute, but there are synthetic cannabinoids that are not illegal.

¶ 13    Jeffrey Moran, an expert in the field of synthetic-cannabinoid pharmacology, metabolism, and detection, testified that JWH-018 is a controlled substance under both federal and Illinois law. He stated that XLR-11 and UR-144 are substantially similar to JWH-018, and he opined that they are analogs of JWH-018.

¶ 14    Jeff File, an Illinois State Police officer, searched the King Puff-N-Stuff after other officers executed the search warrant on the business. He did not find any Mary Joy or other illegal substances in the main customer area. He also searched the glass case on the counter and did not find any Mary Joy or empty Mary Joy packages or any sign that it was for sale.

¶ 15    File also interviewed defendant. Defendant stated that he had about 85 packages of Mary Joy and between 35 and 40 packages of Dead and Berried in his safe in the back room of his store. Defendant stated that he had a number of suppliers whose full names he did not know and that people who purchased the product rolled it into blunts and seemed to get addicted to it. Defendant stated that he used it once and got a head rush but that it did not get him high. He believed that Mary Joy was illegal under federal law, though he was not sure about Illinois, and thus he kept it in the back room. Defendant also stated that he had just purchased 1000 packets from his supplier "Eric" to get him through the winter and that the officers could go to the house and retrieve them. Defendant had been selling Mary Joy for three or four months before his arrest. Defendant placed his Mary Joy money in his right pocket and his other money in his left pocket to pay vendors.

¶ 16    Defendant gave a written statement, in which he admitted that the Mary Joy and the marijuana found in his house and his wife's car were his. As to whether he sold illegal items at his store, he wrote Mary Joy and Dead and Berried. Defendant also wrote that he knew that people misused the drugs by consuming them and that the five times he used Mary Joy, it made him light-headed. He sold 20 to 60 packages of Mary Joy a day, and he did not display it in the store because he was unsure if it was legal. Defendant stated that, because the effects are short-lived, younger people smoke it more often. Defendant also noted that he had a quarter-pound of marijuana in his house.

¶ 17    At the close of the State's evidence, defendant moved for a directed verdict. The trial court granted the motion only as to the cannabis-related count VIII. Counts III and IV were nol-prossed by the State.

¶ 18    Testifying on his own behalf, defendant stated that he had researched the products Mary Joy and Dead and Berried at MaryJoy.com, the website listed on the back of the packages. The site indicated that Mary Joy and Dead and Berried were legal in all 50 states. He also researched every ingredient listed on the back of the packages and found nothing to be illegal. Defendant stated that he displayed his herbal products, including Mary Joy and Dead and Berried, in acrylic cases that sat on the store's counters. He kept one package of each in the

case and the rest in a box underneath the counter. Because there was an attempted but failed third burglary at his store, defendant moved the box out of the main area of the store and placed it in a safe in the back room.

¶ 19 When he was arrested on September 25, 2013, for selling illegal drugs, defendant told the officers that he did not sell illegal drugs. There was no money in the safe where the officers found the Mary Joy and the Dead and Berried. Defendant stated that he never referred to the contents of the safe as "Spice." He had never heard that term. He kept the money from Mary Joy sales in a separate pocket because he bought the packages on consignment and needed to pay his supplier for them. Defendant did not find out that Mary Joy was illegal until the officers told him during the interrogation. Defendant identified surveillance videos from September 21 and 23, 2013, in which he sold Mary Joy to customers using credit cards at the register. Defendant denied saying to the officers that he did not sell drugs at the store anymore.

¶ 20 Following the State's rebuttal case and closing arguments, the trial court found defendant guilty on counts I and II, counts V, VI, and VII, and count IX. The trial court denied defendant's motion to reconsider. Thereafter, the court sentenced defendant. It merged count II into count I and sentenced defendant to six years' imprisonment. As to counts V, VI, and VII, the court sentenced defendant to three years' imprisonment to run concurrently with the sentence on count I. It sentenced defendant to pay a mandatory $750 fine on count IX. Defendant timely appeals.

¶ 21                                                  II. ANALYSIS

¶ 22 Defendant appeals his convictions of unlawful delivery of and possession with intent to deliver a controlled substance. Section 401 of the Illinois Controlled Substances Act states, in relevant part, "[e]xcept as authorized by this Act, it is unlawful for any person *knowingly* to manufacture or deliver, or possess with intent to manufacture or deliver, a controlled substance other than methamphetamine, a counterfeit substance, or a controlled substance analog." (Emphasis added.) 720 ILCS 570/401 (West 2012). Under a charge of either delivery or unlawful possession with intent to deliver, the State must prove that the defendant knew what he or she was delivering or intending to deliver. See *People v. Robinson*, 167 Ill. 2d 397, 407 (1995) (defendant must have knowledge of the presence of the narcotics); *People v. Brooks*, 271 Ill. App. 3d 570, 575 (1995) ("the State was required to prove that defendant knew he was delivering cocaine").

¶ 23 Defendant contests solely whether the State proved beyond a reasonable doubt that he knew that the Mary Joy and the Dead and Berried he delivered or possessed and intended to deliver contained a controlled substance. Because the trial court made a factual determination that defendant knew what he was selling, defendant must establish that the evidence was not sufficient to support this finding.

¶ 24 When a defendant challenges the sufficiency of the evidence, a court of review must determine "whether, [after] viewing the evidence in the light most favorable to the State, ' "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (Emphasis in original.) *People v. Belknap*, 2014 IL 117094, ¶ 67 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985), quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). It is not the role of the reviewing court to retry the defendant. *In re Q.P.*, 2015 IL 118569, ¶ 24. Rather, it is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts. *People v. Bradford*, 2016 IL 118674,

- 5 -

¶ 12. Therefore, a court of review will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses. *Id.* A criminal conviction will not be reversed for insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt. *Belknap*, 2014 IL 117094, ¶ 67.

¶ 25    "A person knows, or acts knowingly or with knowledge of:

    (a) The nature or attendant circumstances of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that his or her conduct is of that nature or that those circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that the fact exists.

    (b) The result of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that that result is practically certain to be caused by his conduct." 720 ILCS 5/4-5 (West 2012).

¶ 26    Knowledge, as an element of a criminal offense, is a question of fact for the trier of fact to decide. *People v. Frazier*, 2016 IL App (1st) 140911, ¶ 23. Direct proof of a defendant's knowledge is unnecessary, and a defendant's knowledge can be inferred from the surrounding facts and circumstances. *Id.* "Knowledge may be, and ordinarily is, proven circumstantially." *People v. Ortiz*, 196 Ill. 2d 236, 260 (2001).

¶ 27    In addressing the issue of knowledge, the trial court relied on *McFadden v. United States*, 576 U.S. ___, 135 S. Ct. 2298 (2015), and *United States v. Ramos*, 814 F.3d 910 (8th Cir. 2016). We find the analyses in *McFadden* and *Ramos* instructive.

¶ 28    In *McFadden*, the United States Supreme Court elucidated two ways the government could prove knowledge in analog cases. The Court explained that the government must either (1) show that the defendant knew that he or she was dealing with some controlled substance, regardless of whether he or she knew the particular identity of the substance, or (2) show that the defendant knew the specific features of the substance that make it a controlled-substance analog, even if he or she did not know its legal status as an analog. *McFadden*, 576 U.S. at ___, 135 S. Ct. at 2302. These features include (1) having a chemical structure that is substantially similar to the chemical structure of a controlled substance and (2) having a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the effect on the central nervous system of a controlled substance or being represented or intended to have that effect with respect to a particular person. *Id.* at ___, 135 S. Ct. at 2304-05 (citing 21 U.S.C. § 802(32)(A) (2012)).

¶ 29    The Court found that such knowledge is sufficient because "[a] defendant who possesses a substance with knowledge of those features knows all of the facts that make his conduct illegal, just as a defendant who knows he possesses heroin knows all of the facts that make his conduct illegal." *Id.* at ___, 135 S. Ct. at 2305. "A defendant need not know of the existence of the [Controlled Substance Analogue Enforcement Act of 1986 (21 U.S.C. § 802 (2012))] to know that he was dealing with 'a controlled substance.' " *Id.* at ___, 135 S. Ct. at 2305. In a footnote, the Court observed that the requisite mental state could be proved by circumstantial evidence, such as a defendant's concealment of his activities, evasive behavior with respect to law enforcement, and knowledge that a particular substance produces a high similar to that produced by controlled substances. *Id.* at ___ n.1, 135 S. Ct. at 2304 n.1.

¶ 30    In *Ramos*, 814 F.3d 910, a case with facts similar to those in the present case, the defendant managed an iWireless store and was convicted of selling synthetic cannabinoids and bath salts. She drove to meet a confidential informant to sell him "Mr. Happy" and bath salts. The defendant sold him one packet of "Mr. Happy" and one jar of "Blue" for $75. She did not charge sales tax for the purchase and did not process the transaction through her register at the store. A test performed by the United States Drug Enforcement Administration (DEA) later determined that the "Blue" contained a substance with a chemical structure substantially similar to that of the controlled substance methylenedioxypyrovalerone (MDPV). A search at the defendant's store revealed Blue in a drawer under the register counter and hundreds of packets containing synthetic cannabinoids around the store, including in a drawer under the counter, a back storage room, and the back office. None of the synthetic cannabinoid products were advertised in the store. A majority of these products contained XLR-11 and some contained UR-144. Each jar of "Blue" contained pyrrolidinopentiophenone (á-PVP). The agents also found smoking paraphernalia, including glass pipes and rolling papers. *Id.* at 912-13. The defendant was found guilty on the drug-related counts. She contended that the government failed to prove that she knew that the synthetic cannabinoid products contained XLR-11 or some other controlled substance. *Id.* at 915.

¶ 31    The court found that the following evidence was sufficient to show the defendant's knowledge that she possessed and sold a controlled substance of some kind. The packets containing synthetic cannabinoid products were not on public display in the store or advertised in any way. A DEA agent who posed as a customer in the defendant's store testified that the defendant produced packets of "Mr. Happy" and "Mr. Nice Guy" only after the agent requested "potpourri," a street name for synthetic cannabinoid products. The defendant, unprompted, asked if the agents needed rolling papers with the "Mr. Nice Guy" purchase, although the product label stated that it was not for human consumption. Hundreds of packets found in the defendant's car contained synthetic cannabinoids, stored out of public view.

¶ 32    The court also found that the evidence was sufficient to show that the defendant knew the specific features of á-PVP that made it a controlled substance, under *McFadden*'s second method of proving knowledge. The evidence suggesting that the defendant knew that she possessed an analog of a controlled substance with a chemical structure similar to a drug listed on the federal drug schedules included that the defendant understood the street term for bath salts, that the defendant attempted to conceal the sale, that the defendant did not charge tax or provide a receipt for the purchase, and that the price for the "Blue," labeled as scouring powder, far exceeded the cost of comparable cleaning products. *Id.* at 917.

¶ 33    Other circumstantial evidence supported the inference that the defendant understood the pharmacological effects of "Blue"; specifically that it produced a high similar to that of a controlled substance, as the defendant stated that the informant would be "real happy" following the late-night transaction. *Id.* at 917-18.

¶ 34    Here, as in *Ramos*, circumstantial evidence supported the inference of the required mental state, such as defendant's concealment of the sales, his evasive behavior with respect to law enforcement, and his knowledge that a particular substance produces a high similar to that produced by controlled substances. The sales took place in a back room, outside public view. The sales were by cash. There was no evidence that defendant charged tax or used a register at the store. Defendant did not provide receipts. The products were not on display or advertised. Hundreds of packages were found in defendant's wife's car. Defendant used cash to purchase

the products from suppliers and knew the suppliers only by their first names. Defendant kept the cash from the sales of the products separate from the proceeds of his other store transactions by placing the cash in his right pocket. Defendant also made statements to Torkleson indicating that he knew the specific features of the products that made them controlled substances. Defendant told him not only that his customers misused the products by smoking them, but that younger individuals smoked them more often because the effects wore off quickly. He also said that he had smoked Mary Joy and it had made him feel light-headed, and he told Torkleson that Dead and Berried could "knock him on his ass." Defendant also told Torkleson that he would sell cannabis to him, and defendant had cannabis in his possession when he was arrested.

¶ 35     Although defendant testified that he placed the products out of sight because of an attempted burglary, this raised a question of credibility, and we give due consideration to the fact that it was the trial court, as the trier of fact, that saw and heard him testify. We defer to the trial court's credibility assessments because a court of review is not in a position to observe a witness as he or she testifies. *People v. Harris*, 297 Ill. App. 3d 1073, 1083 (1998). Even if we were to believe defendant, the other circumstantial evidence was sufficient to establish beyond a reasonable doubt that defendant knew that he possessed and sold products containing controlled substances.

¶ 36     Defendant relies on *People v. Patel*, 2013 IL App (4th) 121111, and *People v. Chatha*, 2015 IL App (4th) 130652. *Patel* and *Chatha* arose from the same transaction. Patel was a convenience store clerk who sold a controlled substance, and Chatha owned the store where the product was sold. A search of the store took place the same day as the sale. Patel was convicted of unlawful delivery of a controlled substance containing synthetic cannabis. *Patel*, 2013 IL App (4th) 121111, ¶ 1. Chatha was found guilty of possession with intent to deliver the synthetic cannabis. *Chatha*, 2015 IL App (4th) 130652, ¶ 2.

¶ 37     In reversing Patel's conviction, the Fourth District Appellate Court noted that the transaction was not like a street-corner drug deal, where knowledge is easier to establish considering that the controlled substance is usually not professionally packaged and is sold in a secretive manner for cash. But in Patel's case, he was a clerk at a convenience store selling hundreds of legal products. Patel scanned the item, and a receipt documented the purchase of " 'incense.' " *Patel*, 2013 IL App (4th) 121111, ¶ 13. The court surmised that it is much more difficult to establish that an employee selling a professionally packaged product from a convenience store, as compared to a street dealer, knew that a product stocked by the store owner contained a controlled substance. *Id.* ¶ 65.

¶ 38     Defendant asserts that *Chatha* closely mirrors his case. The issue in *Chatha*, as here, was whether the evidence was sufficient to prove that the defendant knew that a product, Bulldog Potpourri, he possessed and sold at his store contained a controlled substance. *Chatha*, 2015 IL App (4th) 130652, ¶ 42.

¶ 39     The court reversed Chatha's conviction, finding that the uncontroverted evidence showed that Chatha willingly complied with applicable laws before he started selling Bulldog Potpourri, which demonstrated his concern about the legality of the products offered in his stores. The court noted that Chatha had complied with a city ordinance that prohibited the sale of "incense" and "potpourri" at his other store and that he investigated Bulldog Potpourri to alleviate his concern before offering the product to the public. *Id.* ¶ 54. The court also found

that Chatha's demeanor demonstrated his willingness to comply with police requests during their investigation. The court stated:

> "Under these circumstances, defendant's actions and willing cooperation buttressed his steadfast insistence that if he knew the Bulldog Potpourri contained a controlled substance, he would have stopped selling the product. At best, the State's evidence suggested that defendant knew Bulldog Potpourri was packaged and marketed similarly to products containing substances the legislature had previously banned. However, that evidence was insufficient to establish beyond a reasonable doubt that defendant knew Bulldog Potpourri contained AM-2201." *Id.* ¶ 55.

¶ 40   The court rejected the notion that Chatha's admission that he knew that customers smoked the product put him on notice that the product was presumptively illegal. During his interview, Chatha stated that his knowledge regarding the product's use prompted his store policy banning the sale to minors. The court similarly rejected the State's assertion that the fact that Chatha did not display Bulldog Potpourri was circumstantial evidence of his knowledge that the product contained a controlled substance. The court found that Chatha's actions and demeanor before and after the police began their investigation militated against the State's claim. *Id.* ¶¶ 52-53. Moreover, although a trier of fact might have questioned the effectiveness of Chatha's investigation of the product's legality, the court noted that, absent scientific testing, Chatha could not conclusively determine whether the otherwise legal product contained a controlled substance. *Id.* ¶ 54.

¶ 41   In contrast to *Chatha* and *Patel*, the present case is more like a "street-corner drug deal," where the sales took place in a back room and the products were kept outside of public view, were never scanned, and were sold on an all-cash basis, without receipts. Defendant kept the cash from the sales of the illegal substances separate from his other store transactions by placing that cash in his right pocket. Defendant also had more knowledge about the products than Chatha. Defendant knew that the products were illegal under federal law and knew the effect the substances had on the central nervous system. Whereas Chatha refused to sell the product illegally at his other store, defendant told Torkleson that he would sell him cannabis. We agree with the trial court that the rational inference to be drawn from all of the evidence was that defendant knew that he possessed and sold products containing illegal substances. Accordingly, a rational fact finder could determine that the State met its burden of proof concerning knowledge.

¶ 42                                  III. CONCLUSION

¶ 43   For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2016); see also *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 44   Affirmed.