2020 IL App (1st) 161327-U

No. 1-16-1327

Order filed March 6, 2020

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 6530 |
| | ) | |
| ANTHONY TYSON, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE DELORT delivered the judgment of the court.
Presiding Justice Hoffman and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm defendant's convictions for aggravated discharge of a firearm in the direction of a police officer over his contention that there was insufficient evidence of his accountability for his co-offender's actions and of his co-offender's knowledge that he was discharging a firearm at police officers.

¶ 2    Following a bench trial, defendant Anthony Tyson was found guilty, under a theory of accountability, of three counts of aggravated discharge of a firearm in the direction of three separate police officers (720 ILCS 5/24-1.2(a)(3) (West 2010)) and sentenced to concurrent terms

of 11 years' imprisonment.[1] On appeal, defendant contends that his convictions should be reversed because the State failed to prove beyond a reasonable doubt that he was accountable for co-offender Anthony Gardner's conduct. He also contends that his convictions should be reduced to aggravated discharge of a firearm and the matter remanded for resentencing because the State failed to prove beyond a reasonable doubt that Gardner knew the individuals at whom he fired his gun were police officers. We affirm.

¶ 3       Defendant was charged by indictment with 8 counts of first degree murder, 8 counts of attempt first degree murder, 13 counts of aggravated discharge of a firearm, and 1 count of aggravated unlawful restraint. He waived his right to a jury trial and the case proceeded to a bench trial.

¶ 4       Chicago police officer James McNichols testified that on March 27, 2011, he was conducting a narcotics investigation near Lexington Street and Pulaski Street with his partners Patrick Kelly and Thomas Hanrahan. McNichols was the driver in an unmarked vehicle with his two partners. He was "civilian dressed, plain clothes" with a duty belt, "vest and star." His badge was displayed on his outer belt buckle. McNichols heard a single gunshot, and an older man ran from Lexington to McNichols' vehicle screaming for help. McNichols learned the man's name was Lee Edmonds. Edmonds got in the vehicle and directed McNichols westbound through the south alley of Lexington and directed him to stop near 4035 West Lexington.

---

[1] Although the court orally found defendant guilty of three counts of aggravated discharge of a firearm and sentenced him to concurrent terms, the written sentencing order reflects only one count and one sentence. "When the oral pronouncement of the court and the written order conflict, the oral pronouncement of the court controls." *People v. Roberson*, 401 Ill. App. 3d 758, 774 (2010). Accordingly, we will consider all three convictions.

¶ 5 There, Kelly exited the vehicle from the front passenger seat and approached a man working on a car parked in the alley. Edmonds yelled, "That's not him. That's not him. He is one of us." At that point, McNichols was exiting the vehicle and saw two other men, with guns in their hands, running through an empty lot just west of him. Edmonds, still in the backseat, yelled, "There they are," and McNichols again saw the two men running at him. When McNichols first saw the men, they were 50 to 60 feet away running southbound alongside a fence. McNichols notified Kelly about the men and then started yelling to them, "Police. Drop your weapons." The two men ran to the edge of the alley along the fence, and the man in front raised his weapon and started shooting at McNichols. In court, McNichols identified the man who shot at him as Gardner and identified defendant as the man standing behind Gardner. McNichols and Kelly returned fire. McNichols was directly across the alley from Gardner, approximately 10 to 15 feet away, and Kelly was 7 feet away from McNichols. McNichols saw defendant turn around, start running northbound and throw his gun "over his head behind his back."

¶ 6 Gardner ran and hid behind a beige colored vehicle in the same empty lot. McNichols approached Gardner from a position where he was able to see Gardner, but Gardner could not see him. McNichols commanded Gardner "to drop his weapon and let [McNichols] see his hands." Gardner did not comply and McNichols stepped towards him. McNichols could see Gardner was kneeling next to the passenger side of the car with his head down and his gun in his hand. McNichols again commanded Gardner "to drop the weapon," but Gardner instead lifted his head, looked directly at McNichols, and raised his weapon. McNichols shot Gardner in the head, killing him. Gardner fell forward with his gun on the ground in front of him, and Kelly handcuffed his hands.

¶ 7    McNichols explained that, prior to the second round of shooting, he radioed, "[h]e's running northbound," in reference to defendant. Officers Camarillo, Perez, and Murphy arrived on the scene and McNichols provided Camarillo with a description of defendant that was relayed on the radio. That same night, McNichols viewed a lineup and identified defendant as the man who ran with a gun on Lexington.

¶ 8    On cross-examination, McNichols stated he did not see defendant do anything to encourage or aid Gardner besides running next to him. He stated he did not remember telling detectives on the night of the shooting that he yelled "[d]rop your weapon." He also did not recall telling detectives that he did not say "[p]olice" until after the first shot.

¶ 9    Kelly's testimony was substantially similar to that of McNichols. Kelly added that he was in "civilian dress," wearing a duty belt, vest and a gun, with his badge displayed on his belt. When Kelly observed the other man standing in the alley, he got out of the squad car and performed a pat-down on the man, who told Kelly, "I am not the one you are looking for." Kelly then heard Edmonds yell, "The ones you want are in the vacant lot over there." Edmonds pointed to a vacant lot to the west, and Kelly saw defendant and Gardner approaching. Kelly identified defendant in court as the second man approaching. Kelly saw Gardner fire a round in his direction. Kelly returned fire but did not know if McNichols did or where McNichols was at the time. Kelly did not see where defendant went, but observed Gardner take cover behind a beige car. Kelly heard McNichols yelling "drop the gun," before McNichols fired his gun. Kelly surrendered his gun to a forensic investigator at the hospital. That night, Kelly identified defendant in a lineup as the man with a gun who accompanied Gardner.

¶ 10    On cross-examination, Kelly stated that the squad car the officers were in did not have sirens or emergency lights on it. Kelly saw defendant and Gardner running towards him with guns after other people had alerted him that defendant and Gardner were in the lot. Kelly explained that he did not "even have a chance to" announce he was a police officer before Gardner fired. He did not see defendant after the first shot and did not see defendant hand Gardner his gun or the two speak together.

¶ 11    Hanrahan's testimony was similar to that of McNichols and Kelly. Hanrahan added that he saw Edmonds run up to the officers and state, "there were two men with guns down the alley shooting" and point to the south alley of Lexington, west of the officers. Hanrahan, his partners, and Edmonds entered the squad car with Hanrahan sitting behind McNichols, the driver. They drove westbound into an alley, and Hanrahan saw a man standing in front of a garage. Hanrahan learned the man's name was Gregory Bryant. Edmonds and Bryant both pointed to the west, and Hanrahan exited the vehicle and observed two men in a vacant lot. Hanrahan saw Gardner fire a shot in his and his partner's direction and identified defendant in court as the man who followed Gardner. McNichols and Kelly discharged their guns simultaneously. Hanrahan stated that when McNichols and Kelly fired their guns, he and the other officers were all screaming, "Police, drop your gun. Police, drop your gun." Hanrahan later identified defendant in a lineup as the man who ran from the shootout. Hanrahan did not fire because his partners were in his line of fire.

¶ 12    On cross-examination, Hanrahan stated the vehicle they were in was unmarked with an "M" plate. There were no sirens or emergency lights on the vehicle when it went into the alley. Hanrahan did not yell anything before Gardner fired his gun. Hanrahan did not see defendant with a weapon. He did not see defendant signal or speak to Gardner before the shooting. Upon further

questioning by the court, Hanrahan stated he was in plain clothes, wearing a bullet proof vest, with a duty belt and his "star" on his belt.

¶ 13    Chicago police officer Roberto Ramirez testified that on March 27, 2011, he responded to a shooting near the alley of Lexington and Pulaski. Ramirez and his partner searched the scene and found a Chevrolet minivan less than a block north of the shooting. The van's engine was running, and it appeared empty. Upon closer inspection, the officers saw a woman sitting in the driver's seat fully reclined and a man, who matched the description given over the radio, lying between the front and middle row of seats in the aisle. Ramirez identified this man as defendant in court. Defendant and the woman, Dominque Ashford, were taken into custody. On cross-examination, Ramirez testified he did not recover any weapons in the minivan or from defendant.

¶ 14    Chicago police detective Adrian Garcia testified that on March 28, 2011, defendant spoke with Garcia and Assistant State's Attorney Jose Villarreal. This interview was video recorded, and Garcia testified that the video was a true and accurate copy of their conversation. The video was published for the court and a transcript was made for the court to review.

¶ 15    In the video, defendant, after being advised of his constitutional rights, stated that he knew Gardner "from the streets." On March 27, 2011, defendant and Gardner planned to rob Cecil, a "Vice Lord" drug dealer, who had "a lot of money."[2] The first time defendant went to Lexington that day, he, Gardner, and Scotty, were "getting high" and saw a man, who had shot at them earlier, get into an SUV that was followed by a gold Regal.[3] Later, "[o]ne of [Cecil's] people," shot at the group, but defendant did not see Cecil. The group left the area, and for about an hour, defendant,

---

[2] The record shows that Cecil is referred to as "Cecil Lord" but his last name is unknown.
[3] Scotty's last name does not appear in the record.

Ashford, Gardner, and "another guy" drove around and got high. After they dropped off the unidentified man, defendant and Gardner procured guns. Defendant received his gun from Gardner, who got it from Scotty. Gardner received his gun from another man. Defendant explained that he and Gardner armed themselves for protection and to rob Cecil. Defendant, Ashford, and Gardner then drove to 5th Avenue and Pulaski Street. Defendant and Gardner exited the "van" and returned to the Regal because they thought Cecil may be there. Gardner told defendant to "just look out," and defendant stood in the alley while Gardner walked into a nearby garage. Gardner pointed the gun at the back of a man fixing a car and asked for Cecil's whereabouts. The man responded he did not know, and that Cecil was "somewhere in the building." Defendant then heard a gunshot. Defendant did not see anyone else with a weapon.

¶ 16    Defendant stated he did not see anything and "[w]hen [he] saw the police pulled up, they [*sic*] guns drawn, [he] just ran." He explained that he could tell the men were police. After being asked if they said they were police, defendant responded "yeah" and confirmed it once more. Defendant then heard shots and did not see what happened or what Gardner did. As defendant ran away, his gun fell somewhere. He ran to the minivan and hid there with Ashford until they were caught. He denied having any intentions of shooting Cecil. He stated he had the gun to protect himself and to shoot back.

¶ 17    Chicago police forensic investigator Brian Smith processed the scene of the shooting with his partner Nicholas Ribaudo. They took photographs of the scene and of the minivan. They also recovered the guns McNichols and Kelly had used in the shooting. Ribaudo administered a gunshot residue test ("GSR") to Gardner, who was deceased at the time. They then collected the firearm evidence at the scene of the shooting. The gun recovered from Gardner was a six-chamber

revolver, which contained two spent cartridges and four live rounds. Smith received six live rounds that were in Gardner's possession. There also a fully loaded revolver recovered in the vacant lot. Smith identified multiple areas of apparent gunshot damage on the driver's rear side in photographs of the minivan.

¶ 18   The parties stipulated that Gardner died of multiple gunshot wounds and his blood contained ethanol alcohol at a level of 55 milligrams per deciliter. The parties also stipulated that if called, Illinois State Police forensic scientist Mary Wong would testify as an expert in the area of trace evidence identification testing. Wong received the gun residue kits collected from defendant and Gardner. She analyzed the kits and found that defendant may have discharged a firearm, may have been in the environment of a discharged firearm, may have contacted a primer gunshot residue ("PGSR") related item with his left hand, or may have received the particles from an environmental source. She found that Gardner discharged a firearm, contacted a PGSR-related item, or had his right hand in the environment of a discharged firearm.

¶ 19   The parties further stipulated that Chicago police officer Mark Harvey recovered 10 fingerprint lifts from the minivan, and that Illinois State Police forensic scientist Elanor Giacometti, an expert in the area of fingerprint identification and analysis, received the fingerprint lifts collected. One fingerprint recovered from the interior front passenger window was made by a person "whose fingerprints appear on the copy of the fingerprint card marked Antoine Gardner."

¶ 20   Finally, the parties stipulated that Illinois State Police forensic scientist Mark Pomerance, an expert in firearms and tool mark identification, determined that of the fired bullets recovered from the scene of the shooting, there was one that "could not be identified or eliminated as having been fired from" the gun recovered near Gardner but could not have been fired by the guns

recovered from McNichols and Kelly. He also concluded that a bullet recovered from Gardner's head, was fired by McNichols' gun. Another bullet recovered from Gardner "could not be identified or eliminated as being fired from" Kelly's gun.

¶ 21 The court found defendant guilty of aggravated discharge of a firearm pertaining to the victims McNichols, Kelly, and Hanrahan, and not guilty of all counts of first degree murder, attempt first degree murder, aggravated unlawful restraint, and the remaining count of aggravated discharge of a firearm. In finding defendant guilty, the court determined that defendant and Gardner were shot at and believed the person responsible answered to Cecil, so they planned to rob Cecil in retaliation. As defendant and Gardner looked for Cecil, defendant acted as a lookout while Gardner confronted a man and a shot was fired. Furthermore, the court found that police responded, "indicating clearly to anyone who would see them they're obviously police officers," and Gardner fired a shot and defendant fled before police returned fire.

¶ 22 Defendant filed a motion for new trial, arguing, in part, that the evidence was insufficient to sustain his convictions. The court denied the motion. Following a sentencing hearing, the court sentenced defendant to concurrent terms of 11 years' imprisonment. Defendant did not file a motion to reduce his sentence.

¶ 23 On appeal, we first consider defendant's argument that the State did not prove beyond a reasonable doubt that he was accountable for Gardner's aggravated discharge of a firearm at a police officer.

¶ 24 The standard of review when considering the question of accountability is whether "after viewing evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Fernandez,*

2014 IL 115527, ¶ 13. Under section 5-2 of the Criminal Code of 1961, a person is legally accountable for the criminal conduct of another if "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2010). To establish a defendant possessed the intent to promote or facilitate the crime, the State may present evidence of a shared criminal intent between the principal and defendant, or evidence of a common criminal design. *Fernandez*, 2014 IL 115527, ¶ 13. Where the defendant and another "engage in a common criminal design or agreement any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the common design or agreement and all are equally responsible for the consequences of those further acts." 720 ILCS 5/5-2(c) (West 2010). When there is a common design to do a criminal act, the defendant is guilty of any act done in furtherance of the common design. See *People v. Nelson*, 2017 IL 120198, ¶ 40.

¶ 25    Here, the State presented evidence of a common design between defendant and Gardner to commit a robbery. Defendant stated several times during his interview that he and Gardner intended to rob Cecil. To do so, they procured guns and went to the area where they believed they would find Cecil. There, defendant functioned as a lookout for Gardner, who pointed a gun at a man and asked for Cecil's whereabouts. McNichols and Kelly testified that when the officers arrived, Gardner and defendant approached them armed with guns, and then Gardner discharged a gun in their direction.

¶ 26    On appeal, defendant does not contest that he intended to rob Cecil with Gardner but argues that Gardner was caught off guard and the shooting of a single shot was not in furtherance of a

common criminal design. However, this court has previously explained that just because an officer's appearance at a crime in progress is unexpected, it does not mean a companion shooting at the officer is unrelated to a previous common criminal design. *People v. Johnson*, 2014 IL App (1st) 120701, ¶¶ 26-28 (finding defendant guilty of aggravated discharge of a firearm where defendant argued that the shooting was not in furtherance of common design as no one anticipated officer's presence and defendant had no advanced knowledge of the shooting).

¶ 27    *People v. Kessler*, 57 Ill. 2d 493 (1974) involved a "textbook application of the common-design rule." *Fernandez*, 2014 IL 115527, ¶ 14. In *Kessler*, the defendant and two companions planned a burglary. 57 Ill. 2d at 494. The companions attempted the burglary, were surprised by a man inside the building, and, after finding a gun in the tavern, shot the man and fled to the car where the defendant had remained. *Id.* at 494-95. Afterwards, one companion drove them from the scene and, after getting forced off the road, the companions fled the car. *Id.* at 495. During the foot chase, one started shooting at a police officer. *Id.* During this time, the defendant remained in the car, and, after being arrested, denied any knowledge of the companions and stated he was hitchhiking. *Id.* In affirming the defendant's conviction for attempted murder of a police officer, our supreme court found that as the defendant jointly committed the attempted robbery, he was legally accountable for the other actions of his companions. *Id.* at 499-500. The supreme court affirmed the convictions under the common-design rule and explained that section 5–2(c) of the Code "as it reads, means that where one aids another in the planning or commission of an offense, he is legally accountable for the conduct of the person he aids; and that the word 'conduct' encompasses any criminal act done in furtherance of the planned and intended act." *Id.* at 497; accord *People v. Phillips*, 2014 IL App (4th) 120695, ¶ 26.

¶ 28    Here, defendant does not dispute that he and Gardner were engaged in a common criminal design to rob Cecil. That being the case, defendant is legally accountable for any criminal act that Gardner did in furtherance of the robbery. *Fernandez*, 2014 IL 115527, ¶ 18. The evidence that the discharge of the firearm was in furtherance of defendant's and Gardner's common criminal design is even more compelling than in *Kessler*. In *Kessler*, after the initial planning the defendant remained in the car. *Kessler*, 57 Ill. 2d at 494-95. Here, defendant and Gardner planned to rob Cecil, and then defendant obtained guns with Gardner, acted as lookout and physically approached the officers with Gardner directly up to the time of the shooting. As such we find the evidence presented was sufficient to show that defendant was guilty by accountability of discharge of a firearm towards a police officer.

¶ 29    Next, defendant claims that his flight during the shooting sufficiently separated him from Gardner's actions. A defendant is not accountable if before the commission of the offense he or she terminates his effort to promote or facilitate the commission and does one of the following: "(i) wholly deprives his or her prior efforts of effectiveness in that commission, (ii) gives timely warning to the proper law enforcement authorities, or (iii) otherwise makes proper effort to prevent the commission of the offense." 720 ILCS 5/5-2 (West 2010). In this case, defendant's flight does not constitute withdrawal for accountability purposes.

¶ 30    We next consider defendant's argument that this court should remand the matter for resentencing because the State failed to prove beyond a reasonable doubt that Gardner knew the individuals at whom he fired his gun were police officers, an essential element of the offense.

¶ 31    A challenge to the sufficiency of the evidence supporting a conviction requires the reviewing court to determine whether, after viewing the evidence in the light most favorable to the

State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *People v. Harris*, 2018 IL 121932, ¶ 26. "All reasonable inferences from the evidence must be drawn in favor of the prosecution." *People v. Hardman*, 2017 IL 121453, ¶ 37. A reviewing court may not retry the defendant or substitute its own judgment for the trier of fact on issues of witness credibility, the resolution of conflicts in the evidence, and which inferences to draw from the evidence. *Id.* Instead, a reviewing court will reverse a conviction only if the evidence is so "unreasonable, improbable, or so unsatisfactory" that there remains a reasonable doubt as to the defendant's guilt. *Id.* (quoting *People v. Campbell*, 146 Ill. 2d 363, 375 (1992))

¶ 32     In this case, defendant was found guilty, under a theory of accountability, of aggravated discharge of a firearm in the direction of a peace officer. In order to support the finding of guilt, the State was required to prove beyond a reasonable doubt that "defendant [or one for who he is accountable] intentionally or knowingly discharged a firearm in the direction of a person he knew to be a peace officer while that officer was executing his official duties." *People v. Meyers*, 2018 IL App (1st) 140891, ¶ 25; accord 720 ILCS 5/24-1.2(a)(3) (West 2010).

¶ 33     In this court, defendant disputes whether the evidence presented was sufficient to show that Gardner knew he was shooting at police officers. A person knows something when he is consciously aware that those circumstances exist. 720 ILCS 5/4-5 (West 2010). "Knowledge of a material fact includes awareness of the substantial probability that the fact exists." *Id.* Direct proof of a defendant's knowledge is unnecessary, because it can be informed from surrounding facts and circumstances and " '[k]nowledge may be, and ordinarily is, proven circumstantially.' " *People v. Monteleone*, 2018 IL App (2d) 170150, ¶ 26, (quoting *People v. Ortiz*, 196 Ill. 2d 236, 260 (2001)).

¶ 34   After viewing the evidence in the light most favorable to the State, we find that a rational trier of fact could conclude that Gardner knew he was shooting at police officers. The record shows that the officers arrived on the scene in an unmarked police vehicle with an "M" license plate. Although the officers were not in uniform, they were wearing bulletproof vests and duty belts, with their police stars visible on their belts. McNichols testified that he first saw Gardner and defendant 50 to 60 feet away and that they continued to approach even after he said "[p]olice, drop your weapons." When Gardner fired and the officers returned fire, McNichols estimated Gardner was only 10 to 15 feet away. Hanrahan stated that after Gardner fired, he and the other officers screamed, "[p]olice, drop your gun. Police, drop your gun." Kelly testified that he did not have a chance to announce he was an officer before Gardner fired. In his videotaped statement, defendant, who was standing behind Gardner, acknowledged that he recognized the approaching men as police officers and heard them say they were police.

¶ 35   In finding defendant guilty, the court expressly noted that the officers' actions "indicat[ed] clearly to anyone who would see them that they were police officers." As mentioned, this court will not substitute its own judgment for the trier of fact on which inferences to draw from the evidence. Although defendant asks us to disregard his own recognition of the men as officers and focus on the sudden nature of the encounter, we decline to do so where "the trier of fact is not required to disregard inferences which flow normally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Jackson*, 232 Ill.2d 246, 281 (2009). Given the record before us, we cannot say that the evidence, taken in the light most favorable to the State, was so unreasonable,

improbable or unsatisfactory that there remains a reasonable doubt as to Gardner's knowledge that he was shooting at police officers. *Hardman*, 2017 IL 121453, ¶ 37.

¶ 36    Accordingly, the judgment of the circuit court of Cook County is affirmed.

¶ 37    Affirmed.